The **LENAPE RESOURCES CORPORA-TION** d/b/a Pomfret Production Company, Inc., and d/b/a Enercorp Resources, Inc., Tesoro Exploration and Production Company, Gulf Energy Pipeline Company and Coastal Oil & Gas Corporation, Petitioners,

v.

**TENNESSEE GAS PIPELINE COMPANY, Respondent.**

No. 94–0278.

Supreme Court of Texas.

Argued Dec. 13, 1994.

Decided April 18, 1996.

Rehearing Overruled Aug. 16, 1996.

Jane M.N. Webre, Austin, William T. Armstrong, III, San Antonio, Rudy A. England, Houston, Dwight A. Dalrymple, Houston, Emerson Banack, Jr., San Antonio, Charles R. Roberts, San Antonio, Ernest E. Smith, III, Austin, Frank Douglass, Austin, Elizabeth N. Miller, Austin, Steve Selby, Austin, for petitioners.

Thomas H. Watkins, Austin, C.A. Davis, Austin, Elizabeth G. Bloch, Austin, John R. Hathaway, Austin, Theodore R. Tetzlaff, Chicago, IL, Donald R. Cassling, Chicago, IL, Norman M. Hirsch, Chicago, IL, Ralph H. Duggins, Fort Worth, Sloan B. Blair, Fort Worth, H. Carter Burdette, Fort Worth, for respondent.

ENOCH, Justice, delivered the opinion of the Court on Motion for Rehearing, in which CORNYN, SPECTOR, BAKER, and ABBOTT, Justices, join.

We grant Petitioners' motions for rehearing. We withdraw our opinion and judgment of August 1, 1995 and substitute the following opinion.

The principal issue in this case is whether the good faith and proportionality restrictions of section 2.306 of the Uniform Commercial Code, TEX.BUS. & COM.CODE § 2.306, apply to the take-or-pay gas purchase agreement between Lenape Resources Corporation and Tennessee Gas Pipeline Company. The court of appeals held that the take-or-pay contract was an output contract subject to section 2.306. 870 S.W.2d 286. We disagree. We reverse in part and affirm in part the judgment of the court of appeals.

Tennessee transports and stores natural gas for distribution to customers who provide natural gas to consumers throughout the southern United States. Tennessee entered into the Gas Purchase Agreement (GPA) in 1979 with Lenape's predecessor in interest. Under the GPA, Tennessee agreed to take, or pay for if not taken, gas produced from gas reserves committed under the GPA. The committed reserves include the Fantina Yzaguirre Gas Unit and the Jesus Yzaguirre Gas Unit in Zapata County.

In entering into the GPA in August 1979, Tennessee sought to obtain as much gas as could be produced from the committed reserves. The GPA plainly reflects this objective. Specifically, the GPA provides that Lenape is not obligated to deliver to Tennessee any predetermined quantities of gas or to maintain any predetermined level of deliverability; that Lenape may unitize its leases with other properties in the same field; and that Lenape, in its sole discretion, may drill new wells to all depths and horizons and repair or rework old wells.

From the beginning of the GPA term in 1979 until 1989, Lenape produced gas from

only two wells on the committed acreage, one of which was a low-producing stripper well. Despite this low production, Tennessee sought to be released from its obligations under the GPA. In the early 1980s, market conditions for natural gas changed dramatically. The price and demand for natural gas plummeted. Roland, Comment, *Take-or-Pay Provisions: Major Problems for the Natural Gas Industry*, 18 St. Mary's L.J. 251, 262 (1986). In 1983, Tennessee sent its producers, including Lenape, notice that it was instituting an "emergency gas purchase policy," whereby Tennessee proposed to reduce its purchases and limit its take-or-pay obligations and refused to recognize any take-or-pay obligations for producers who refused to amend their contracts as Tennessee demanded. *See Mandell v. Hamman Oil & Ref. Co.*, 822 S.W.2d 153, 156–57 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (Tennessee reduced its take-or-pay obligations with gas producer by half under emergency gas purchase policy). Again in 1985 and 1986, Tennessee sought to be released from its obligations under the GPA first by seeking to amend the GPA and next by asserting a force majeure defense based on depressed market conditions.

In light of these developments, Lenape had little incentive to increase production or develop new wells. Lenape's lessors grew impatient with the low production and sued Lenape for breach of its implied covenant to develop the leases underlying the committed acreage, for failure to produce in paying quantities, and for abandonment of the leases. Tesoro Exploration and Production Company obtained lease options from the lessors and backed the lessors in their lawsuit against Lenape. Lenape settled the lawsuit with its lessors and agreed to unitize part of the committed acreage with adjacent property. The unitization formed the Guerra A and B units, each comprised of one-half of the committed acreage and additional acreage outside the GPA's committed acreage. After unitization, Lenape entered into a farmout agreement with Tesoro and Coastal

Oil & Gas Corporation. As a result of the farmout, Tesoro and Coastal became "Sellers" under the GPA. Tesoro drilled three wells, one bottomed on the committed acreage and two inside the Guerra A and B units on acreage outside the acreage originally committed to the GPA. The two wells on the Guerra A and B units were highly successful.

The successful Guerra A and B wells would vastly increase Tennessee's take-or-pay obligations. Tennessee sued Lenape and the other Sellers in August 1990 seeking a declaration under various theories that it was not obligated to take or pay for any of the increased production resulting from the Guerra A and B wells. Specifically, Tennessee sought a declaration that:

(1) the GPA is governed by section 2.306 of the UCC and that current and anticipated gas production from the Guerra A and B wells[1] is in bad faith and unreasonably disproportionate to prior production in violation of section 2.306;

(2) alternatively, if not governed by section 2.306, the GPA is void and unenforceable for indefiniteness and lack of mutuality;

(3) alternatively, Tennessee is not obligated to take or pay for quantities of gas tendered in bad faith and which do not comport with prior history and course of performance;

(4) the GPA covers only the Sellers' interest in the reserves physically located under the leases originally dedicated to the GPA and Tennessee is not obligated to purchase gas produced from wells outside the original leases;

(5) the GPA does not permit pooling;

(6) the Fantina Yzaguirre Gas Unit leases terminated for Lenape's failure to produce in paying quantities, failure to reasonably develop, and abandonment of the leases and thus are no longer subject to the GPA; and

(7) the parties did not intend for the price of non-regulated gas to escalate by the

---

**1.** There is no evidence in the record of the extent of the increased production. Tennessee claims that if this cause were remanded, it would show that for the first twelve years of the GPA, it never

paid more than $300,000 for gas produced in any single year. In 1993, by contrast, Tennessee claims it paid under protest $89 million for gas produced under the GPA.

annual inflation adjustment factor plus a growth factor.

In addition, Tennessee asserted that Lenape, Tesoro, and Coastal's conduct, including their "bad faith pooling," violated the Deceptive Trade Practices and Consumer Protection Act. TEX.BUS. & COM.CODE §§ 17.41–.63.

Lenape counterclaimed, alleging breach of contract, anticipatory repudiation, and that Tennessee's DTPA claims were asserted in bad faith. Tesoro and Coastal asserted similar counterclaims. These counterclaims and the DTPA claims have been resolved and are not at issue in this appeal.

The trial court granted a partial summary judgment for the Sellers, determining: (1) the GPA is not an output contract subject to section 2.306; (2) the GPA permits pooling/unitization; and (3) Tennessee could not contest the validity of the leases underlying the GPA. After a bench trial on the remaining issues, the trial court rendered judgment for the Sellers on all of Tennessee's remaining claims. Specifically, the trial court found: (1) the Sellers had not acted in bad faith in drilling the new wells or forming the Guerra A and B units; (2) the GPA is not void for indefiniteness or lack of mutuality; (3) the GPA allows for unitization and obligates Tennessee to purchase the Sellers' interest in gas produced anywhere within the pooled units; (4) the GPA mandates that the price for non-regulated gas escalate in accordance with section 102(b)(2) of the Natural Gas Policy Act; and (5) escrow monies and attorneys' fees should be paid to the Sellers.

The court of appeals reversed the trial court's summary judgment on the section 2.306 issue, holding that the GPA is an output contract subject to the good faith and proportionality restrictions of section 2.306. 870 S.W.2d at 291–92. With the exception of Tennessee's DTPA claims, which were voluntarily resolved by agreement of the parties, the court of appeals affirmed the remainder of the trial court's judgment. All parties sought writ of error in this Court. We consider the Sellers' contentions first, then those of Tennessee.

## I

■ Whether section 2.306 of the UCC applies to this take-or-pay contract is a question of first impression in this jurisdiction. Section 2.306 applies only if (1) the take-or-pay contract is an output contract, and (2) the parties have not otherwise opted to vary the quantity obligations by agreement. TEX. BUS. & COM.CODE § 2.306; *Jon–T Chems., Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1416 (5th Cir.1983). The GPA defines the quantity of gas Tennessee must take or pay for as a percentage of the Sellers' capacity to deliver gas. Specifically, section 3(a) of the GPA provides:

> 3. `Quantity:
>
> (a) Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase and receive, or pay for if available and not taken, Seller's pro rata part of the following quantities of gas produced from the committed reserves:
>
> . . . .
>
> (ii) A quantity of gas well gas equal to eighty-five percent (85%) of Seller's delivery capacity.

Delivery capacity is defined in section 1(f) of the GPA as:

> Seller's pro rata part of the average amount of gas well gas per day which can be efficiently withdrawn from the wells on the lease(s) in the course of a delivery capacity test conducted as provided in section 3(f) hereof under applicable rules and regulations and in accordance with prudent operating practices, the production from which is covered by this Agreement and which is available for delivery . . .

Tennessee asserts the GPA is an output contract simply because the quantity is defined in terms of Lenape's delivery capacity, i.e., its capacity to produce natural gas from the covered acreage. This construction, while alluring in its simplicity, ignores the realities of gas production.

■ An output contract is one in which the buyer agrees to buy the seller's entire output of production. Under a take-or-pay contract, the buyer does not have to buy any production. The take-or-pay contract provides for alternative performance by the buyer: either

purchase a specified quantity of gas or pay the producer for the right to purchase that quantity of gas in the future. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 689 (10th Cir.1991). Because of this alternative performance, the pay option under a take-or-pay contract is not a payment for the sale of gas. *Id.*; *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1167–68 (5th Cir.1988); *see also Mandell*, 822 S.W.2d at 164–65; *Killam Oil Co. v. Bruni*, 806 S.W.2d 264, 268 (Tex.App.—San Antonio 1991, writ denied). Rather, it is a payment for the exclusive dedication of reserves for a fixed period of time. *International Minerals & Chem. Corp. v. Llano, Inc.*, 770 F.2d 879, 882 (10th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310 (1986); Medina et al., *Take or Litigate: Enforcing the Plain Meaning of the Take-or-Pay Clause in Natural Gas Contracts*, 40 ARK. L.REV. 185, 188 (1986). If a buyer opts not to take any gas, the gas remains in the well unproduced. Thus, the quantity of gas actually produced and purchased by the buyer is determined in large part by the buyer's nominations.

Other forces delimit gas production as well. The laws of physics obviously affect a producer's ability to produce gas. Further, regulatory constraints of the Texas Railroad Commission limit the amount of gas that may be produced. To say that the quantity is determined solely by the Sellers' output or delivery capacity thus oversimplifies the physical realities of gas production and overstates the Sellers' control over the quantity of gas produced.

■ Regardless of whether the take-or-pay contract is an output contract, section 2.306 does not apply to this gas purchase agreement because the parties agreed to quantity obligations that differ from those imposed by section 2.306. Section 2.306, like many other provisions of Article 2 of the UCC, is a gap-filler and may be varied by the parties' agreement. TEX.BUS. & COM.CODE § 1.102(c); *Jon–T Chems.*, 704 F.2d at 1416; WHITE & SUMMERS, UNIFORM COMMERCIAL CODE 111–12 (2d ed. 1980); *see also Prenalta*, 944 F.2d at 687 (gas purchase contracts are contracts for the sale of goods and are

governed by Article 2, but parties can vary the provisions of the UCC by agreement); *Colorado Interstate Gas Co. v. Chemco, Inc.*, 854 P.2d 1232, 1236 (Colo.1993) (parties to take-or-pay gas contract may vary provisions of the UCC by agreement); Weistart, *Requirements and Output Contracts: Quantity Variations Under the UCC*, 1973 DUKE L.J. 599, 622 (as an alternative to section 2.306, contracting parties will be mindful of the Code's invitation to modify its basic rules by agreement).

As a gap-filler, section 2.306 operates to render output and requirements contracts definite. Under the UCC, a contract for the sale of goods for the price of $500 or more is not enforceable absent some writing evidencing a contract for the sale that has been signed and that specifies a quantity. TEX. BUS. & COM.CODE § 2.201(a). A contract does not fail for indefiniteness if the parties intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. *Id.* § 2.204(c). Section 2.306 renders output and requirements contracts sufficiently definite as to quantity and enforceable by reading into such contracts a quantity that is the actual good faith output or requirements of the particular party. *Id.* § 2.306 cmt. 2.

■ Section 2.306 fills in the quantity term only when a contract does not unambiguously specify the quantity of the output of the seller or the requirements of the buyer. *Id.* § 2.306(a). It does not apply when the contract either specifies a numeric quantity or provides a standard for determining a specific quantity. *See Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 790 (5th Cir.1975) (contract for sale of cotton sufficiently definite when quantity may be determined from acreage covered by contract and estimated yield of acreage); *Fort Hill Lumber Co. v. Georgia–Pacific Corp.*, 261 Or. 431, 493 P.2d 1366, 1368 (1972) (contract not indefinite when contract for purchase of all timber logged provided method for determining quantity).

The GPA requires Tennessee to purchase a set quantity of gas produced from the committed reserves defined as eighty-five percent of Lenape's delivery capacity. Le-

nape's delivery capacity is a readily ascertainable quantity, measured as often as once every three months through a delivery capacity test. The specific quantity of natural gas for which Tennessee must take or pay is a simple mathematical calculation: .85 multiplied by Sellers' delivery capacity. Section 2.306 does not apply to fill in the quantity—good faith tender—because the quantity is specified as a determinable amount, Sellers' delivery capacity.

Tennessee insists that unless section 2.306 is read into the GPA to vary its terms, the GPA's quantity provisions effect a waiver of the good faith and reasonableness standards of the UCC, contrary to section 1.102(c) of the UCC. Section 1.102(c) provides:

> [T]he obligations of good faith, diligence, reasonableness and care prescribed by this title may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

TEX.BUS. & COM.CODE § 1.102(c). We do not agree that the GPA disclaims any good faith or reasonableness standards.

The GPA does permit the Sellers to increase delivery capacity by drilling new wells and by unitizing the committed reserves. But nothing in the GPA permits the Sellers to undertake these activities in bad faith. Any increase in delivery capacity is still subject to the good faith obligation of section 1.203 as defined in sections 1.201(19) (honesty in fact) and 2.103(a)(2) (for merchants, honesty in fact and observance of reasonable commercial standards of fair dealing in the trade). The UCC limits Tennessee's take-or-pay obligations to good faith increases in delivery capacity.

Moreover, Tennessee's reading of the GPA would render the quantity term of the GPA uncertain. Instead of defining Tennessee's take-or-pay obligations in terms of a fixed percentage of Sellers' delivery capacity, Tennessee would have us read the GPA as requiring Tennessee to purchase only a portion of gas that may be tendered as reasonably proportionate to any normal or otherwise comparable prior output. The quantity of gas which Tennessee must either take or pay for would depend on a number of indeterminate variables: prior output; *normal* prior output; *comparable* prior output; *proportionality* to either normal or comparable prior output; and *reasonableness* of the proportionality. Reading these factors into Tennessee's take-or-pay obligations, any increase in production and delivery capacity would be measured after the fact by these variables, thus injecting uncertainty into the parties' obligations under the GPA.

Not only does the contract specify the quantity with sufficient definiteness, but the GPA also expresses the parties' agreement to provide for production increases subject to Tennessee's take-or-pay obligations. The take-or-pay contract specifically provides that the Sellers are not obligated to deliver to Tennessee any predetermined quantities of gas or to maintain any predetermined level of deliverability. Additionally, the GPA gives the Sellers the right to increase production, and thereby increase delivery capacity, through unitization. The GPA further provides that the Sellers may, in their sole discretion, drill new wells. It does not limit production to existing wells in discovered reservoirs. Accordingly, the GPA anticipates that the Sellers may drill new wells in new depths and horizons and increase production and delivery capacity in discovering new reserves.

These provisions taken together demonstrate that the parties to the GPA, both sophisticated players in the oil and gas industry, expected that production and delivery capacity could increase significantly. To read section 2.306 as limiting the quantity obligations under the take-or-pay contract here would eviscerate the contract the parties bargained for in 1979.

Tennessee bargained for the exclusive right to purchase "all gas produced from the committed reserves." Tennessee also contracted to encourage increased production by Lenape by giving Lenape the right to develop new wells and to unitize any of its leases. In exchange for the exclusive dedication and access to Lenape's reserves, Tennessee gave Lenape a take-or-pay clause ensuring Le-

nape a set market for its gas production and a steady cash flow. *International Minerals,* 770 F.2d at 882; Medina, *Take or Litigate,* 40 ARK.L.REV. at 188.

Tennessee would have this Court rewrite the parties' contract on Tennessee's concession that it no longer will demand the exclusive dedication of the gas reserves. Tennessee concedes that any gas produced in violation of section 2.306 may be sold by Lenape to third parties. While a party may concede certain facts that have implications under the law, here Tennessee is making a concession of a contractual obligation (waiving its right to exclusive dedication of reserves) in exchange for a restriction on Lenape's rights under the GPA (application of section 2.306 to limit production). Tennessee's concession is not really a concession. It is simply another way of arguing that it should be relieved of its obligation to take or pay for eighty-five percent of Lenape's delivery capacity.

Applying section 2.306 to the take-or-pay clause, as Tennessee urges, would fundamentally alter the risk allocation of the take-or-pay clause in gas purchase contracts. We recognized recently that the "central purpose underlying take-or-pay contracts" is to "allow the risk of fluctuations in market demand to be allocated to the buyer." *Exxon Corp. v. West Texas Gathering Co.,* 868 S.W.2d 299, 302 (Tex.1993). In applying section 2.306 to the take-or-pay clause, Tennessee retains the benefits of the exclusive dedication of Lenape's reserves essentially under a right of first refusal, but Lenape no longer has a certain market for its natural gas. Any increase in production will be subject to an after-the-fact determination of whether the increased amount is "unreasonably disproportionate" to prior normal or comparable production and, if so, will relieve Tennessee from its minimum take-or-pay obligation.

Shifting the market risk back to the producer will inevitably chill exploration and production. Pierce, *Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry,* 97 HARV.L.REV. 345, 357 (1983). Why develop new wells if there is no buyer? In the event of a decline in the market, producers may well be left with an unmarketable product. Further, producers rely on the steady cash flow of take-or-pay contracts to cover operating expenses as well as exploration and production costs of new wells. Thus, a revision of the take-or-pay relationship that reduces the certainty of cash flow creates financial uncertainty for the gas producer that will discourage investment in the natural gas industry. Roland, Comment, 18 ST. MARY'S L.J. at 261 n. 51, n. 57; *see also* Johnson, *Natural Gas Sales Contracts,* 34 INST. ON OIL & GAS TERMS 83, 111 (1983) (guaranteed income from take-or-pay clause used as collateral). Altering the market risk thus injects into the producer-pipeline relationship instability that discourages investment in the industry. *See* Roland, Comment, 18 ST. MARY'S L.J. at 261 (take-or-pay provision adopted to minimize instability).

The instability is compounded by compromising the lessor-lessee relationship as well. Texas law places upon lessees an implied obligation to reasonably develop the land covered by the oil and gas lease. *Grubb v. McAfee,* 109 Tex. 527, 212 S.W. 464, 465 (1919). Thus, to fulfill its obligations to its lessors, a gas producer must drill additional wells as would a reasonably prudent operator. *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 693–94 (1959). Applying section 2.306 in these circumstances would dissuade a producer from drilling new wells, contrary to the producer's obligations under an oil and gas lease. As a result, if a producer does not drill additional wells, it may be liable to its lessors for breach of the implied covenant to reasonably develop the lease; if a producer does drill additional wells that produce in large quantities, it may be unable to market the increased production. Further, it is questionable whether a reasonably prudent operator would drill additional wells if the producer has either no market or an uncertain market for the increased production. Applying section 2.306 to this take-or-pay contract may have profound ramifications not only for the producer-pipeline relationship but also for lessor-lessee relationship and natural gas exploration in general.

In sum, we hold that section 2.306 of the UCC does not apply to rewrite the parties'

bargained-for contract. The GPA requires Tennessee to take or pay for eighty-five percent of Lenape's delivery capacity, an amount readily ascertainable by simple mathematical calculation. It clearly expresses the parties' expectations that Tennessee's take-or-pay obligations would extend to any good faith increases in delivery capacity, even though such increases may be significant. To apply section 2.306 contrary to the express terms of the GPA not only rewrites the quantity term of the GPA, but also effects a fundamental shift in the party bearing the market risk and injects uncertainty into the natural gas production industry. The take-or-pay gas purchase contract is not subject to section 2.306. The court of appeals erred in holding otherwise.[2]

## II

In its application for writ of error, Tennessee first complains that the court of appeals erred in holding that there was sufficient evidence to support the trial court's finding that the parties intended to include a double escalation factor in the price of the unregulated natural gas subject to the GPA. We agree with the court of appeals.

When the parties executed the GPA on January 16, 1979, the price for natural gas was regulated by the Federal Energy Regulatory Commission. All of the gas produced from the Fantina Yzaguirre and the Jesus Yzaguirre wells has remained price-regulated under section 102(b)(2) of the Natural Gas Policy Act of 1978, Pub.L. No. 95–621, 92 Stat. 3350, 3358 (repealed 1989) (the "NGPA"). Section 8(c) of the GPA requires Tennessee to pay the highest maximum price allowed by regulation for gas produced that is subject to the regulations. The GPA also provides a mechanism to calculate the price of "new natural gas," or gas not subject to the regulations, in the event that the production price became deregulated. The price for "new natural gas" was deregulated in 1985. As a result, all the gas produced from the Guerra A wells No. 1 and No. 4 and the Guerra B well No. 1 is classified as "new natural gas," and section 8(a) of the GPA governs calculation of its price.

Section 8(a) provides as follows:

8. *Prices:*

(a) The price to be paid by Buyer to Seller from the effective date hereof for all gas delivered hereunder, or for the contract quantity if available and not taken by Buyer, shall be $2.067 per Mcf, escalating on the first day of January, 1979 and the first day of each month thereafter for the term of this Agreement to the product obtained by multiplying the price in effect hereunder for the preceding month by the monthly equivalent of the *annual inflation adjustment factor applicable for such month, as such factor is defined in Section 102(b)(2) of the Natural Gas Policy Act of 1978*, Public Law 95–621.

(emphasis added)

This language is inconsistent because the "annual inflation adjustment factor" is not defined in section 102(b)(2) of the NGPA. Rather, the annual inflation adjustment factor is defined in section 101(a) of the NGPA.[3] Section 102(b)(2), the section specifically referenced in the above quoted paragraph, instead defines an inflation adjustment factor unique to gas that is subject to section 102.[4]

---

2. Because of our disposition on this issue, we need not address and express no opinion on the application of section 2.306 standards to output or requirements contracts governed by that section.

3. Section 101(a)(1) provides that the "annual inflation adjustment factor" shall be the sum of (A) a factor equal to one hundredth of the quarterly percent change in the GNP implicit price deflator; plus (B) a correction factor of 1.002. NGPA § 101(a)(1), 92 Stat. at 3356.

4. Section 102(b)(2) of the NGPA states:

The maximum lawful price under this section for any month shall be—

. . . .

(2) in the case of any month [after April 1977], the maximum lawful price, per million Btu's, prescribed under this subsection for the preceding month multiplied by the monthly equivalent of a factor equal to the sum of (A) the annual inflation adjustment factor applicable for such month; plus (B) . . . (ii) .04, in the case of any month beginning after April 20, 1981.

NGPA § 102(b)(2), 92 Stat. at 3358.

The unique inflation adjustment factor of section 102 incorporates not only the annual inflation adjustment factor defined in section 101(a) of the NGPA, but also an independent and additional growth escalation factor.

Tennessee contends that the section in question provides for the single annual inflation adjustment escalation factor defined in section 101(a) of the NGPA, even though that section is not referenced in section 8(a) of the GPA. The Sellers, on the other hand, contend that the same section provides for the application of the double escalation factor defined in section 102(b)(2) of the NGPA as specifically referenced in the GPA.

 Our first task is to determine, as a matter of law, whether section 8(a) of the GPA is ambiguous. If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and it can be construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). If its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration circumstances present when the particular writing was executed, then it is ambiguous and its meaning must be resolved by a finder of fact. *Id.* at 394; *see also Sage Street Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445–46 (Tex.1993) (trial court properly submitted ambiguity to jury when issue was tried by consent).

 In construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the written instrument. *Coker*, 650 S.W.2d at 393. If the written instrument is ambiguous, the trier of fact may look to parol evidence to determine the parties' intent. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex.1980); *see also Paragon Resources Inc. v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 996 (5th Cir.1983). The court of appeals correctly held that section 8(a) is ambiguous.

Tennessee employs a number of rules of construction to support its interpretation that the parties intended section 8(a) to escalate the gas price by only the single inflation adjustment factor. Tennessee argues that

when there is variance between unambiguous written words ("annual inflation adjustment factor") and figures ("§ 102(b)(2)"), the written words control. *See Guthrie v. National Homes Corp.*, 394 S.W.2d 494, 496 (Tex. 1965). In addition, it argues that terms stated earlier in a contract ("annual inflation adjustment factor") are favored over subsequent terms ("§ 102(b)(2)"). *See Coker*, 650 S.W.2d at 393. Moreover, the language used by the parties ("factor," not "factors", modified by "defined in") should be accorded its plain, grammatical meaning unless it definitely appears the parties' intent would thereby be defeated. *See Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex.1985).

 Each application of these rules of construction propounded by Tennessee leads to the complete negation of the line "defined in Section 102(b)(2) of the Natural Gas Policy Act of 1978." In construing a contract, we strive to give meaning to each provision. *Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 53 (Tex.1964). Moreover, we have stated that a court should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. Thus, a court need not embrace strained rules of construction that would avoid ambiguity at all costs. *Reilly v. Rangers Management, Inc.* 727 S.W.2d 527, 530 (Tex.1987). On balance, we conclude that section 8(a) of the GPA is ambiguous as a matter of law, so that the trial court's consideration of parol evidence was proper.

 Based on that parol evidence, the trial court found that the parties intended to include two escalating factors in the price escalation of the non-regulated gas. Tennessee contends that the court of appeals erred in holding that some evidence supported this finding. We disagree.

The Sellers' expert testified that the term "annual inflation adjustment" has a unique meaning in the industry, encompassing both growth and escalation adjustment factors. In addition, the only remaining living person who participated in the negotiations, Charles Faulk, testified that the base price stated in section 8(a) came from section 102 of the

NGPA, and that the reference to section 102(b)(2) in section 8(a) is intentional. Faulk, a Tennessee employee who negotiated on Tennessee's behalf, further testified that the reference was discussed with and approved by Tennessee's attorneys and that it was a part of the standard agreement used by Tennessee.

We therefore hold that the court of appeals did not err in holding that the provision was ambiguous and in affirming the trial court's finding that the parties intended the price of non-regulated new natural gas to escalate by both factors included in section 102(b)(2) of the NGPA.

### III

██ Tennessee next complains that although the GPA gives the Sellers the right to unitize, it did not afford the Sellers the right to force Tennessee to purchase a proportionate share of the gas produced from unitized acreage.

As we note above, Lenape's lessors sued to terminate the leases in the Fantina Yzaguirre gas unit. By a settlement on August 17, 1989, however, all parties agreed that the Fantina Yzaguirre leases remained intact and had remained intact at all times. Lenape unitized the committed acreage, forming the Guerra A and B units, each consisting of one-half of the committed acreage from the Fantina unit and one-half new acreage. The trial court found that because half of the land within the units is GPA acreage, Tennessee was obligated to purchase fifty percent of eighty-five percent of the Sellers' delivery capacity from the new wells. The court of appeals affirmed the trial court's finding. 870 S.W.2d at 299–300. We agree.

The GPA specifically granted to the Sellers the power to "unitize its lease(s) with other properties of Seller[s] and of others in the same field." The district court found that the Sellers' unitization was not done in bad faith, and Tennessee does not challenge that finding.

Tennessee argues it is only required to take or pay for whatever gas is produced from "committed reserves." "Committed re-

serves" is defined in section 3(e) of the GPA as follows:

> (e) The term "committed reserves" shall mean all of the gas reserves located in and under the lease(s) described in Exhibit "B" and outlined in Exhibit "C" hereto which are attributable to the interest of Seller therein.

Tennessee claims that because of this definition, it is required to take or pay for gas produced only from below the committed acreage and not gas produced from land unitized into the tract. We disagree.

Section 5(e) of the Gas Production Agreement provides that production of gas from wells located on any tract included in the unit will be considered production under the GPA:

> 5. *Reservations of Seller:* Seller reserves the following prior rights with sufficient gas to satisfy such rights:
>
> . . . .
>
> (e) To unitize its lease(s) with other properties of Seller and of others in the same field, *in which event this Agreement will cover Seller's interest in the unit attributable to the reserves committed hereunder.*

(emphasis added) The GPA's committed acreage comprises fifty percent of the new units. Tennessee does not dispute that as between the Sellers and the other owners of interests in the unit, "Sellers' interest in the unit attributable to the reserves committed hereunder" is fifty percent. Therefore, the court of appeals correctly concluded that Tennessee is obligated to purchase fifty percent of eight-five percent of the Sellers' delivery capacity of gas produced from the wells anywhere on the units.

### IV

██ The last issue that we must consider is whether Tennessee may properly contest the continued viability of the GPA under section 5 of that contract based on a termination of the underlying leases between the Sellers and the lessors for failure to produce in paying quantities. The trial court granted summary judgment to the Sellers, holding that Tennessee was not entitled to establish

that the leases were no longer in force. The court of appeals affirmed. 870 S.W.2d at 294–95. Again, we agree.

Tennessee relies on section 5(a) of the GPA, which expressly provides:

> 5. *Reservation of Seller:* Seller reserves the following prior rights with sufficient gas to satisfy such rights:
>
> (a) To operate its property free from any control by Buyer in such a manner as Seller, in its sole discretion, may deem advisable, including without limitation, the right, but never the obligation, to drill new wells, to repair and rework old wells, and to plug any well or surrender any lease or portion thereof when no longer deemed by Seller to be capable of producing gas in paying quantities under normal methods of operation; provided, however, in the event Seller should terminate or surrender any lease described in Exhibit "B" and outlined in Exhibit "C" hereto, written notice of same shall be given to Buyer within thirty (30) days. Should Seller terminate or surrender any lease, or a portion thereof, covered by this Agreement, said lease or portion shall be released from the terms of this Agreement effective as of the date of such termination or surrender. Upon Seller's request, Buyer agrees to amend this agreement to effect such a release.

Under this provision, Tennessee maintains that the GPA is no longer in force for any lands on which it could show that the oil and gas lease had terminated or reverted back to the landowners pursuant to the operation of the lease's terms for failure to produce in paying quantities. In settling their lawsuit against Lenape, however, Lenape's lessors agreed:

> to confirm and declare that said Fantina Yzaguirre leases in all of their terms, conditions and provisions have been from the dates of the leases, and currently are, binding upon Plaintiffs [lessors] and ... and that the Fantina Yzaguirre leases are valid and subsisting oil, gas and mineral leases ... and have been at all times since the dates of such leases.

Tennessee was not notified of the lawsuit or the settlement. It seeks now to prove the occurrence of an event, namely the termination of the underlying leases, that releases it from its duty to purchase gas pursuant to the GPA.

The unambiguous language of section 5(a) of the GPA, however, grants to Sellers, not Buyer, the contractual right to surrender any lease when no longer deemed by Sellers to be capable of producing gas in paying quantities. The record is undisputed that Lenape has never surrendered any of the leases, nor has Lenape deemed any lease to be no longer capable of producing in paying quantities. Section 5(a) provides only that "Should *Seller* terminate or surrender any lease ... said lease ... shall be released from the terms of this agreement." (emphasis added). There is no contention that the Sellers have affirmatively terminated or surrendered any lease. The provision at issue is found in a section entitled "Reservations of Sellers." Thus, Tennessee is precluded from attempting to prove under section 5(a) of the GPA that the contract is no longer in effect due to the termination of the underlying leases. We express no opinion on whether Tennessee could prove that the GPA was no longer in effect based upon any theory or claim other than one based on section 5 of the GPA.

\* \* \* \* \* \*

We hold that section 2.306 does not apply to the take-or-pay gas purchase agreement at issue here. We reverse those parts of the court of appeals' judgment reversing the trial court's partial summary judgment on section 2.306 of the UCC and the final judgment on escrow funds and attorneys' fees and render judgment on those issues in accordance with the trial court's judgment. We affirm the remainder of the judgment of the court of appeals.

PHILLIPS, C.J., files a concurring and dissenting opinion, in which GONZALEZ, HECHT and OWEN, JJ., join.

PHILLIPS, Chief Justice, delivered a concurring and dissenting opinion.

I join in parts II, III, and IV of the Court's opinion. Because I believe that the Gas Purchase Agreement ("GPA") at issue here is an output contract which is subject to section

2.306 of the Uniform Commercial Code, however, I cannot join in a decision to reinstate the trial court's summary judgment. As I explain below, I would remand the case to the trial court for further proceedings as to whether the Sellers' increased tender of gas either occurred in bad faith or was unreasonably disproportionate to prior output.

## I

Output contracts are open-quantity contracts in which the quantity is determined by the seller's output or production of a certain commodity. Because of their lack of a quantity term, output contracts "have historically had two problems: indefiniteness and lack of mutuality." *See* HENNING & WALLACH, THE LAW OF SALES UNDER THE UNIFORM COMMERCIAL CODE ¶ 3.08[2] (Rev. ed. 1992). The "common-law hostility to output and requirements contracts," 1 HAWKLAND, UNIFORM COMMERCIAL CODE SERIES § 2–306:01 (Art 2) (1995), is evidenced by numerous pre-Code cases refusing to enforce such contracts due to the lack of a specified quantity. *See, e.g., Crane v. C. Crane & Co.,* 105 F. 869, 873 (7th Cir.1901); *Harrington Bros. v. City of New York,* 51 F.2d 503, 505 (S.D.N.Y.1931); *Sealtest S. Dairies Div. v. Evans,* 103 Ga.App. 835, 120 S.E.2d 887 (1961); *G.H. Baber v. Lay,* 305 S.W.2d 912 (Ky.1957). *See also* Annotation, 14 A.L.R. 1300 (1921).

Section 2.306 of the UCC provides a statutory mechanism for saving output contracts. It solves what the official comments refer to as the "specific problem" of requirement and output contracts by providing that

[a] term which measures the quantity by the output of the seller or the require-ments of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimated to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

TEX.BUS. & COM.CODE ANN. § 2.306(a) (Vernon 1994). The Texas Legislature has made the UCC applicable to mineral sales contracts by declaring that gas is a good if it is to be severed from the land. *Id.* § 2.107(a) ("A contract for the sale of minerals or the like (including oil and gas) ... to be removed from realty is a contract for the sale of goods within this chapter....")[1]

The GPA at issue in this case is that type of mineral sales agreement commonly called a "take-or-pay" contract. Distilled to its essence, "[a] take-or-pay contract obligates a pipeline to purchase a specified volume of gas at a specified price and, if it is unable to do so, to pay for that volume." *Mobil Oil Exploration & Producing Southeast, Inc. v. United Distrib. Cos.,* 498 U.S. 211, 229, 111 S.Ct. 615, 627, 112 L.Ed.2d 636 (1991). In many take-or-pay contracts, the "specified volume" is not a fixed quantity of gas, but is instead a volume of gas equal to a particular measurement specified in the contract. The obligation to purchase may be expressed in terms of a percentage of reserves or, as in this case, a percentage of deliverability.

Whether such a take-or-pay contract for the sale of gas is an output contract is an issue of first impression in Texas. Indeed, there appear to be only two cases addressing this issue, both of which have concluded that

---

1. Almost every other state has adopted an identical provision stating that a contract for the sale of minerals, including oil and gas to be severed from land, is a contract for the sale of goods under the UCC. ALA.CODE § 7-2-107; ALASKA STAT. § 45.02.107; ARIZ.REV.STAT.ANN. § 47-2107; ARK.CODE ANN. § 4-2-107; CAL.COM.CODE § 2107; COLO.REV.STAT.ANN. § 4-2-107; CONN.GEN.STAT.ANN. § 42a-2-107; DEL.CODE ANN. tit. 6, § 2-107; D.C.CODE § 28:2-107; FLA.STAT.ANN. § 672.107; GA.CODE ANN. § 11-2-107; HAW.REV.STAT.ANN. § 490:2-107; IDAHO CODE § 28-2-107; ILL.ANN. STAT. ch. 810, para. 5/2-107; IND.CODE ANN. § 26-1-2-107; IOWA CODE ANN. § 554.2107; KAN.STAT. ANN. § 84-2-107; KY.REV.STAT ANN. § 355.2-107; ME.REV.STAT.ANN. tit. 11, § 2-107; MASS.GEN.LAWS ANN. ch. 106, § 2-107; MICH.COMP.LAWS ANN. § 440.2107; MINN.STAT.ANN. § 336.2-107; MISS. CODE ANN. § 75-2-107; MO.ANN.STAT. § 400.2-107; MONT.CODE ANN. § 30-2-107; NEB.REV.STAT. § 2-107; NEV.REV.STAT. § 104.2107; N.H.REV.STAT.ANN. § 382-A:2-107; N.J.STAT.ANN. § 12A:2-107; N.M.STAT.ANN. § 55-2-107; N.Y.U.C.C.LAW § 2-107; N.C.GEN STAT. § 25-2-107; N.D.CENT.CODE § 41-02-07; OKLA.STAT.ANN. tit. 12A, § 2-107; OR. REV.STAT. § 72.1070; 13 PA.CONS.STAT.ANN. § 2107; R.I.GEN.LAWS ANN. § 6A-1-107; S.C.CODE ANN. § 36-2-107; S.D.CODIFIED LAWS § 57A-2-107; TENN.CODE ANN. § 47-2-107; UTAH CODE ANN. 70A-2-107; VA.CODE ANN. § 8.2-107; WASH.REV.CODE ANN. § 62A.2-107; W.VA.CODE § 46-2-107; WIS. STAT.ANN. § 402.107.

a take-or-pay contract is an output contract. *See United States v. Great Plains Gasification Assoc.,* 819 F.2d 831, 834 (8th Cir.1987) (applying Illinois law on the contract issues) (concluding that a take-or-pay contract "unambiguously require[s] the pipelines to purchase the project's entire output"); *American Exploration Co. v. Columbia Gas Transmission Corp.,* 779 F.2d 310, 311 (6th Cir.1985) (applying Ohio law) (stating that in a contract nearly identical to the one at issue here, "[t]he basic structure of the contract is thus that of a fixed-price output contract").

Sellers contend that the GPA is not an output-contract, making section 2.306 inapplicable. Their first argument is grounded in the contract's provision that the Buyer may either "take", that is, cause to be produced and then purchase "nominated" gas, or "pay", that is, compensate the Sellers for the exclusive dedication of the reserves for the contract period. The presence of the "pay" alternative for performance means, they claim, that the quantity term is not determined solely by the Seller's output or delivery capacity. Yet the GPA clearly states that the "Buyer agrees to purchase and receive, or pay for if available and not taken ... a quantity of gas well gas equal to eighty-five percent (85%) of Seller's delivery capacity." Thus, whether taking or paying, the Buyer is obligated to compensate the Sellers for a quantity of gas measured by the delivery capacity of the Sellers' wells.[2]

The "take-or-pay" aspect of the GPA simply reflects that, because of the nearly unique nature of the sale and production of natural gas, gas is not actually produced and does not become the seller's "output" if the buyer does not take delivery. This is not a valid basis for removing gas purchase contracts from the reach of section 2.306. Since the buyer's obligation under the contract is dependent upon the seller's physical capacity to deliver gas at a given point in time, that is, the seller's potential output, I conclude that the GPA is an output contract.

Sellers next argue that the GPA is not an output contract because only a finite amount of gas exists under the committed acreage, whereas an output contract assumes that the seller can increase production at will. I find nothing in section 2.306 to indicate that infinite production or purchasing capability is a requisite for an output contract. While the total volume of gas under the dedicated acreage does constitute the outer limit of production that could be subject to the GPA, the acreage of a farm or a forest or various practical limitations on factory capacity constitute similar limits which do not render output contracts impossible. Other courts have applied section 2.306 to various non-manufacturing sales contracts in which, as here, output cannot be easily regulated by simply increasing or decreasing component parts. *See, e.g., Orange & Rockland Utils., Inc. v. Amerada Hess Corp.,* 59 A.D.2d 110, 397 N.Y.S.2d 814 (1977) (utility fuel oil); *Shea–Kaiser–Lockheed–Healy v. Dep't of Water & Power,* 73 Cal.App.3d 679, 140 Cal. Rptr. 884 (1977) (aggregate for concrete); *Philadelphia Corp. v. Niagara Mohawk Power Corp.,* 207 A.D.2d 176, 621 N.Y.S.2d 237 (1995) (hydroelectricity). *See also, State Dept. of Fisheries v. J–Z Sales Corp.,* 25 Wash.App. 671, 610 P.2d 390, 393–94 (1980) (discussing potential application of 2.306 to

---

2. Moreover, the authorities cited by Sellers and the Court in support of the argument that "paying" is not purchasing are not convincing. *See Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 689 (10th Cir.1991); *Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159, 1167–68 (5th Cir.1988); *Mandell v. Hamman Oil and Refining Co.,* 822 S.W.2d 153, 164–65 (Tex. App.—Houston [1st Dist.] 1991, writ denied) ("Take or pay is not a payment for production; it is a payment for non-production."); *Killam Oil Co. v. Bruni,* 806 S.W.2d 264, 267–68 (Tex. App.—San Antonio 1991, writ denied). The latter three authorities involve only an interpretation of the royalty clause in a contract. Here, however, we must decide whether a particular

type of gas purchase agreement is subject to a statute that applies to mineral sales in general. Other courts, including the *Prenalta* court, have held that gas purchase and sales agreements containing a take-or-pay clause are subject to Article 2 of the UCC. *See Prenalta,* 944 F.2d at 687–90. (holding, in case involving take-or-pay contracts, that gas purchase contracts are governed by Article 2 of the UCC despite acknowledging that payments made under the contracts pursuant to the "pay" alternative are not payments for the sale of gas); and *Universal Resources Corp. v. Panhandle E. Pipe Line Co.,* 813 F.2d 77, 78–80 (5th Cir.1987) (applying Article 2 of the UCC to a gas purchase contract containing a take-or-pay clause).

contract for surplus salmon eggs and carcasses).

## II

The Court reaches its decision without ever resolving whether the GPA is an output contract. Instead, it bases its decision on the conclusion that section 2.306 is a "gap-filler" provision which is inapplicable here, even if the GPA is an output contract, because the parties, by the provisions of the GPA itself, "agreed to quantity obligations that differ from those imposed by section 2.306." 925 S.W.2d at 570. Although I would decide, rather than merely assume, the threshold issue, I would hold that section 2.306 does apply because the GPA has all the "gaps" that normally exist in an output contract.

At the outset, I reject Sellers' argument that the quantity "gap" here is filled by the physical attributes of the reservoir, which limit the volume of gas that can be produced under the GPA, much as a tract of land physically limits the quantity of a crop that can be produced on it during a year. *See Tennell v. Esteve Cotton Co.*, 546 S.W.2d 346 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.) (holding that a contract covering all of the cotton produced from a tract of land during a year was not governed by section 2.306 because identification of the "entire production" was sufficiently specific). This argument is not convincing. Even if *Tennell* was correctly decided, this case differs from a crop production case in that here the parties did *not* contract for the "entire field of gas," or anything like it. They contracted for 85% of Sellers' delivery capacity for twenty years. That could be all of the gas, or only a fraction of it, depending not only on fortune and physics, but also to some extent on the Sellers' aggressiveness in exploring and developing the underlying leases. The physical attributes of the committed reservoir simply are not such a firm quantity figure for the parties' take-or-pay obligation as to remove the GPA from the ambit of section 2.306.

For similar reasons, I reject Sellers' argument and the Court's conclusion that various quantity provisions in the GPA "fill the gap." While it may be true that section 2.306 "does not apply when the contract either specifies a numeric quantity or provides a standard for determining a specific quantity," [3] 925 S.W.2d at 570, I cannot conclude, as the Court does, that the "GPA requires Tennessee to purchase *a set quantity of gas* defined as eighty-five percent of Lenape's delivery capacity." 925 S.W.2d at 570 (emphasis added). There is nothing "set" about the quantity here, as the perhaps several hundredfold increase in production that actually occurred amply demonstrates. Indeed, the rest of the Court's opinion is replete with statements proving that delivery capacity is anything but a "set quantity." As the Court points out, the GPA permits the Sellers to increase delivery capacity by drilling new wells and unitizing, provides that Sellers are not obligated to deliver any predetermined quantity or to maintain any predetermined level of deliverability, anticipates that the Sellers may increase delivery capacity, and demonstrates by virtue of all its provisions taken together that the parties expected that delivery capacity could increase significantly. 925 S.W.2d at 570–571. Delivery capacity under this GPA, then, is anything but a "set quantity." Rather, as Tennessee argues, it is a "moving

---

**3.** I agree that if a contract "specifies a numeric quantity or provides a standard for determining a specific quantity" for the *total* amount of the commodity to be sold under that contract, it is manifestly not an output contract subject to section 2.306, but rather an ordinary supply contract providing for the sale of a fixed quantity of goods. *See Cooper v. Fortney*, 703 S.W.2d 217, 219 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). The same conclusion would apply to a contract which purported to measure quantity by output but in fact specified a fixed numeric quantity for that output, as in "I will sell you all my output of widgets, which we agree will total 100 widgets per month." Note, however, that by its very terms, section 2.306 applies to an output contract which specifies an *estimate* of what output will be.

I strongly disagree, however, with the Court's suggestion that section 2.306 does not apply to a contract which "provides a standard for determining a specific quantity" for output on an ongoing basis over the life of the contract. If that were true, section 2.306 would never apply. *All* output contracts will provide for some means of measuring what the specific quantity of output under the contract is on an ongoing basis—how else would the buyer make the payments due for that quantity of output?

target" that the parties had the right to retest at least as often as every three months, or even more often under certain circumstances. The delivery capacity provisions of the GPA do nothing to negate the application of section 2.306.

The Court claims that two cases support its conclusion that the quantity specified in the GPA—delivery capacity—is a determinable amount that takes the contract outside the reach of section 2.306. Neither does so. *Riegel Fiber Corp. v. Anderson Gin Co.,* 512 F.2d 784, 790 (5th Cir.1975), held that contracts for the sale of cotton grown on a certain number of acres which provided a projected yield per acre were not unenforceable for lack of definiteness. The court endorsed the view that "simply by multiplying the number of acres stated in the contracts times the estimated yield, one derives a quantity term stated in pounds of cotton." *Id.* at 790 n. 14. Similarly, *Fort Hill Lumber Co. v. Georgia–Pacific Corp.,* 261 Or. 431, 493 P.2d 1366, 1368 (1972), held that a contract for all existing hemlock trees to be logged in a certain area over a period of approximately two years contained the requisite definiteness "because the total area to be logged was known ... and it is possible, therefore, to determine the volume of the hemlock in the total area." In both these cases, the contract provided a standard for determining a specific total quantity (of corn or logs) subject to the contract. Here, there is no such standard. Delivery capacity measures only "the Sellers' pro rata part of the average amount of gas well gas per day which can be efficiently withdrawn from the wells on the lease(s)" at the time the test is taken. Delivery capacity provides no standard whatsoever for determining a specific total quantity of gas subject to the GPA. Thus, the GPA contains the same quantity "gap" that all output contracts contain, a "gap" that the UCC fills with the dual provisions of good faith and reasonable proportionality contained in section 2.306.

The Sellers argue, however, that there is no quantity gap because the GPA clearly communicates the parties' intent as to quantity—to wit, that there be no limits on the amount of gas which Sellers could produce. This allowance for infinite output, in conjunction with the requirement that Tennessee purchase 85% of delivery capacity, is specific enough to displace any "gap filling" good faith requirements of section 2.306 which might otherwise apply. .

I agree that the GPA clearly sets out the parties' expectations and intent that quantity not be limited to any amount. Moreover, trial court finding of fact No. 3, unchallenged by any party, states:

When the parties negotiated the GPA in 1978 and 1979, and executed it on January 16, 1979, Buyer needed and wanted to obtain under long term commitment or dedication as much gas as possible, and the parties intended that the GPA not limit, for any reason, the volume of the committed reserves or amount of gas to be delivered therefrom to Buyer by Seller(s) over the 20–year term of the GPA.

Consistent with this finding, the trial court concluded in part:

The GPA as a whole is unambiguous. If, however, the GPA were to be considered ambiguous, the court's construction stated herein expresses the true intentions of the parties at the time of the execution of the GPA in 1979.

... The GPA does not limit, for any reason, the volume of committed reserves or amount of gas to be delivered therefrom to Buyer by Seller(s) over the 20–year term of the GPA.

I conclude, however, that the "gap" inherent in all output contracts and in this GPA—the lack of a certain quantity term—can not be successfully "filled" by a statement of intent that there be no limit on quantity.

The Code supports this conclusion. Section 1.102 of the Code provides that "the obligations of good faith, reasonableness and care prescribed by this title may not be disclaimed by agreement," although "the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable." Thus, parties may not by contract waive the application of section 2.306; but they may, by "not manifestly unreasonable" provisions, set the

standard of performance by which good faith and reasonableness are measured.

A contract which intentionally sets *no limits* whatsoever on increases in quantity hardly sets a standard of performance by which good faith or reasonableness is measured. Since the Code prohibits waiver of the obligations of good faith and reasonableness, and the parties have not set their own standard by which compliance with these standards may be measured, I reject Sellers' argument that the parties by the terms of the GPA have displaced section 2.306.[4]

The Sellers and numerous amici have urgently suggested that such a holding would ineluctably bring the oil and gas industry in Texas to a grinding halt. Their arguments, while no doubt sincere, are for several reasons not persuasive.

First, I am not convinced that applying section 2.306 would make the GPA and contracts like it less certain than not applying it. Having no limit whatsoever on quantity is hardly a means of ensuring certainty, except perhaps for Sellers, who want to be certain that the sky's the limit on quantity sold in a rising market for their product.

Nor do I believe that applying section 2.306 would fundamentally alter the risk allocation of the take-or-pay clause in gas purchase contracts. The Seller still has a certain market for all the natural gas it pumps in good faith and in a reasonable proportion to estimated or prior output. This should be, in almost all cases, all the gas that a Seller produces. As I discuss below, what is "reasonable" will depend on the parties' expectations, which in almost any oil and gas setting must encompass very wide fluctuations in quantity.

Finally, I do not believe that the GPA's exclusive dedication of the reserves suffices to excuse the application of section 2.306. The Court mischaracterizes Tennessee's "concession" that any gas produced in viola-

tion of section 2.306 may be sold by Lenape to third parties as a veiled attempt to have this Court rewrite the parties' contract. However, applying section 2.306 to the GPA no more rewrites that contract than applying any section of the UCC to any other freely bargained contract. Tennessee's "concession," moreover, is consistent with the contract. Section 4 of the GPA states:

*Commitment of Reserves*

(a) Seller commits to the performance of this Agreement all gas produced from the committed reserves.

(b) Seller agrees not to sell to any other party or parties, except contractors conducting drilling or reworking operations for Seller, any gas produced from the committed reserves during the term hereof without *the written consent of Buyer.*

. . . . .

(Emphasis added.)

### III

Having concluded that the GPA is an output contract to which section 2.306 applies, I next consider how the good faith and unreasonably disproportionate standards of that provision operate in this case. At the outset, I would consider the nature of the good faith requirement under section 2.306, with specific focus on whether this good faith standard is further defined by the unreasonably disproportionate standard, or whether good faith and unreasonably disproportionate are two separate standards.

The *good faith standard* applicable to output and requirements contracts under section 2.306 of the Code, as under the common law, permits quantity variations for valid business reasons and disallows quantity variations caused by speculation or contract manipulation to take advantage of a favorable differential between market and contract price. *See generally* Stacey Silkworth, *Quantity Variation in Open Quantity Contracts,* 51

---

4. It is not enough to conclude, as the Court does, that the GPA *does not disclaim* the good faith and reasonableness standards or that, regardless of section 2.306's applicability, any increase in delivery capacity is still subject to the good faith obligation of section 1.203. The issue is whether the dual requirements of good faith and reason-

ableness under section 2.306 apply, or whether the parties have *set their own standard* by which compliance with these standards may be measured, thereby displacing section 2.306. Because the GPA's "no limits" standard is no standard at all, I conclude that section 2.306 applies.

U.PITT.L.REV. 235, 265–67 (1990).[5] Thus, the basic test for good faith here is whether and to what extent the Sellers would have increased the quantity of gas proffered had the contract price equaled the market price, *i.e.*, was there a valid business reason for the increased quantity independent of price? As Silkworth points out, "[w]hereas the good faith test considers the conduct of the parties, the reasonableness test speaks to the magnitude of the quantity variation itself." *Id.* at 275.

When faced with increases in quantity under an open-quantity contract, most courts and commentators have recognized a distinction between reasonable proportionality and good faith in applying section 2.306. *See, e.g., Shea–Kaiser–Lockheed–Healy,* 140 Cal. Rptr. at 890 (demand for aggregate in excess of 20% over contract estimate held unreasonably disproportionate); *Philadelphia Corp.,* 621 N.Y.S.2d at 240 (declaratory judgment that under three output contracts for sale of hydroelectricity which did not contain stated estimates, no quantity unreasonably disproportionate to prior output may be tendered); *Orange and Rockland Utilities, Inc.,* 397 N.Y.S.2d at 818 (demand for more than double the estimated amount of fuel oil held unreasonably disproportionate). *See also State Dept. of Fisheries v. J–Z Sales Corp.,* 610 P.2d at 394 (Wash.App.1980) (opining that, if section 2–306 applied, output of ⅔ more than contract estimate would be unreasonably disproportionate); 1 ALDERMAN, A TRANSACTIONAL GUIDE TO THE UNIFORM COM-MERCIAL CODE, § 1.33–12, at 75 (2d ed. 1983) ("In addition to acting in good faith, the requirements buyer or output seller must also keep his demands within an amount not 'unreasonably disproportionate' to any stated estimate or normal output or requirements."); 1 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 3–8, at 167 (3d ed. 1988) ("An increase might be in good faith, yet unreasonably disproportionate to prior requirements."); John C. Weistart, *Requirements and Output Contracts: Quantity Variations Under the UCC,* 1973 DUKE L.J. 599, 647 ("Properly read, section 2–306 operates as a codification of both the good faith standard and an equitable limitation on the extent to which quantities can be increased by the quantity-determining party.").[6]

The clear statutory language of section 2.306 imposes a standard of reasonable proportionality that is separate from the requirement of good faith. In recognizing reasonable proportionality as a standard distinct from good faith under section 2.306, the court in *Orange and Rockland* said: "Obviously this language ['no quantity unreasonably disproportionate'] is not the equivalent of 'lack of good faith' [because] it is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute." *Orange and Rockland,* 397 N.Y.S.2d at 818. The court concluded: "Thus, even where one party acts with complete good faith, the section limits the other party's risk in accordance with the reasonable expectations of the parties." *Id.* at 819.

5. Silkworth's analysis of numerous pre- and post-Code quantity variation cases leads her to conclude:

> The business reason factor and the contract manipulation factor lend context to the pre-Code good faith standard. Many courts and commentators have stated that the primary concern in quantity variation cases is good faith. Courts have been reluctant to define good faith; ... [n]evertheless, ... courts have held that the presence of a valid business reason and/or the absence of contract manipulation constitute good faith in open quantity contracts. On the other hand, absence of a business reason and/or presence of contract manipulation constitute bad faith in open quantity contracts. The U.C.C. has codified this good faith standard.

Silkworth, *supra,* at 270 (footnotes omitted).

6. In cases involving decreases in quantity, most courts applying section 2.306 have held that the quantity-determining party, whether a requirements buyer or output seller, should be held to only a good faith standard. *See, e.g., Atlantic Track & Turnout Co. v. Perini Corp.,* 989 F.2d 541, 544–45 (1st Cir.1993); *Empire Gas,* 840 F.2d at 1337–38; *Angelica Uniform Group, Inc. v. Ponderosa Sys., Inc.,* 636 F.2d 232, 232 (8th Cir.1980) (per curiam). While some commentators have criticized the disparate treatment of increases and decreases, *see* Silkworth, *supra,* at 268–70; Owings, Note, *Output Contracts and the Unreasonably Disproportionate Clause of § 2–306,* 59 Mo.L.REV. 1051, 1059–60 (1994), there is no need to resolve any inconsistency here, nor do I make any comment on the standards applicable to quantity decreases, since this case involves only an increase of quantities tendered by an output seller.

Having recognized that section 2.306 imposes separate requirements of reasonable proportionality and good faith for quantity increases under an output contract, I would address in turn the applicability of each proviso to the GPA.

In addressing reasonable proportionality, the first inquiry must be whether or to what extent it must be dependant on the parties' expectations. *Orange and Rockland* concluded that it could not be expressed by a fixed quantity. Instead, for the reasonable proportionality limitation to take effect, "it is not enough that a demand for requirements be disproportionate to the stated estimate; it must be *unreasonably so in view of the expectation of the parties." Orange and Rockland,* 397 N.Y.S.2d at 819 (emphasis added). I agree. Applying the unreasonably disproportionate limitation to disallow an increase in fuel oil requirements that was 63% greater than the contract estimate, *Orange and Rockland* held:

> Defendant had no reasonable basis on which to forecast or anticipate an increase of this magnitude. Indeed the contract suggests the parties contemplated that any variations from the estimate would be on the downside.... [T]he quantities of oil utilized ... were not within the reasonable expectations of the parties when the contract was executed, and accordingly we hold that those "requirements" were unreasonably disproportionate to the contract estimates.

*Id.* at 822 (citation omitted). *See also* 1 WHITE & SUMMERS, *supra,* § 3–8 at 167 (stating that "[t]he word 'unreasonably' allows for the interplay of almost any factor a court properly considers relevant," and suggesting that anticipation of large increases in requirements might prevent the party resisting the increase from prevailing under section 2.306). Thus, the parties' expectations should not be considered only in light of past performance under the contract, as urged by Tennessee, but also in light of the original expectations of the parties as well as the industry context in which their agreement was made.

Tennessee argues that the increase in quantity of gas tendered by Sellers from the new wells is unreasonably disproportionate because it is so great compared to Sellers' prior output under the GPA. But whether the magnitude of the disproportion here is unreasonable under section 2.306 depends on the expectations of the parties when the contract was executed and whether such an increase in output could have been reasonably forecast or anticipated. *Orange and Rockland,* 397 N.Y.S.2d at 822. Objective indicia of the parties' reasonable expectations at that time may also be considered, including the size and capabilities of the pipe lines and other facilities, the history of the area, the nature of the formation, local industry practices, reserve and deliverability estimates and so forth.

The parties' expectations should also be considered in light of the general nature of the industry. The possibility of greatly increased output, and the awareness of that possibility, is an essential characteristic of the oil and gas industry, which provides the context in which the GPA must be considered. Texas courts have long recognized that the existence of oil or gas in a particular tract of land and "the amount of [a well's] output" is highly speculative. *Hatt v. Walker,* 33 S.W.2d 489, 499 (Tex.Civ.App.—Dallas 1930, writ dism'd w.o.j.), *followed in KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.,* 746 S.W.2d 238, 244–45 (Tex. App.—Houston [1st Dist.] 1987, writ denied).

Moreover, these sophisticated parties obviously were aware of Lenape's duty as lessee to reasonably develop the leases underlying the GPA, *see Sun Exploration and Prod. Co. v. Jackson,* 783 S.W.2d 202, 204 (Tex.1989) (discussing *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684 (1959)), and Lenape's duty as an operator to protect the leasehold from drainage, which could give rise to a duty to drill an offset well under certain circumstances. *See Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 568 (Tex.1981). Especially in light of Lenape's duties under the underlying leases, Tennessee's reasonable expectations had to encompass the possibility that at any time during the twenty-year term, new and productive wells might be drilled. Likewise, the parties' reasonable expectations would have encompassed reasonable industry

practices relating to the production and sale of gas. On remand, the parties would have the opportunity to put forward all such relevant evidence concerning the nature of the industry as it impacts the parties' reasonable expectations at the time the GPA was entered into.

Given the nature of the oil and gas industry and the relationship of unreasonable proportionality to parties' expectations, it should be clear that producers will not face a jury trial over the enforceability of a take-or-pay gas purchase contract every time a new well is drilled or a successful strike is celebrated. Only in extraordinary cases will a fact issue be raised as to whether a tendered quantity is unreasonably disproportionate to prior output under section 2.306. Even then, of course, "[i]t is fundamental that an issue, which is normally a question of fact, can be proved so conclusively by the evidence at trial that it becomes a question of law, rather than a question of fact." *Dixon v. Southwestern Bell Tel. Co.*, 607 S.W.2d 240, 242 (Tex.1980). Whether the complained-of increased quantity of gas tendered in this case is unreasonably disproportionate under section 2.306 as a matter of law is not raised in this Court.

Finally, I would also remand to the trial court for further proceedings regarding whether Sellers caused the complained-of increase in production to occur in bad faith, *i.e.*, for no valid business reason or for the purpose of manipulating the contract to take advantage of a price disparity in their favor. If the increased output did not occur in good faith, section 2.306 should apply to prevent Sellers from forcing Tennessee to pay for the bad faith increase.

Tennessee contends and I agree that it was prevented from trying the issue of good

faith because the trial court ruled on summary judgment that section 2.306 does not apply to the GPA. Since the trial court decided as a matter of law that section 2.306 did not apply, there was no opportunity to present evidence of or arguments about the Sellers' failure to abide by the provisions of that section.

Sellers counter that section 2.306 does not contain the only good-faith requirement in the UCC. The official comments indicate that section 2.306 applies to requirement and output contracts the general good faith requirement of the Code, codified in section 1.203, and further defined for merchants in section 2.103(a)(2).[7] Thus, the same obligation of good faith applies to an output contract whether it is through the general application to all sales contracts of section 1.203, in conjunction with section 2.103(a)(2), or through the good faith requirement of section 2.306, applicable to output contracts. Based on these observations, the Sellers originally contended in this Court that Tennessee was not denied its right to prove bad faith, but rather that Tennessee voluntarily gave up that right by its own act of dismissing all section 1.203 good faith claims in a Motion for Agreed Partial Judgment.[8]

On rehearing, Sellers correctly point out that Tennessee did not dismiss its bad faith claims under section 1.203 against Lenape. The motion for agreed partial judgment states: "Plaintiff Tennessee Gas Pipeline has agreed to dismiss any of its claims for bad faith or lack of good faith that it may have against [Tesoro and Coastal] . . . with the exception of, and it expressly reserves to itself, any claims that it might have under Section 2.306 of the Uniform Commercial Code." The Agreed Partial Judgment signed by the trial judge likewise reflects

---

7. The official comments state that section 2.306(1) applies to the "specific problem" [of the absence of a quantity term in output and requirements contracts] the general approach of the Act which "requires the reading of commercial background and intent into the language of any agreement and demands good faith in the performance of that agreement." Tex.Bus & Com.Code § 2.306 cmt. 1. The Code's general good faith and reasonableness requirement provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or

enforcement." Tex.Bus. & Com.Code § 1.203. Good faith is further defined for merchants as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Tex.Bus. & Com.Code § 2.103(a)(2).

8. The Application for Writ of Error filed jointly by Tesoro, Coastal, Lenape and Gulf states that "on the eve of trial, Tennessee dismissed with prejudice all claims for bad faith under § 1.203, but retained its claim under § 2.306."

that Tennessee's agreement was with Tesoro and Coastal, not Lenape. Tennessee thus went to trial against Lenape with a live good faith claim under section 1.203, and the trial judge found no bad faith as to the formation of the new units and the drilling of the new wells.

However, the central question of whether the increased output complained of by Tennessee occurred for a valid business reason or as a result of speculation and/or contract manipulation by the Sellers has not been fully litigated. The record indicates that the case was tried under the assumption that the court had precluded any argument that the contract was an output contract.[9] As a result, the trial judge could not have focused on whether the complained-of increase in quantity tendered under an output contract occurred in bad faith, whether under section 2.306 or section 1.203.[10] Therefore, I would remand this action to the trial court for further proceedings on the issue of the Sell-

ers' good faith with regard to the increased production of gas subject to the GPA.

This is a very unusual, perhaps a unique, case. It involves wildly fluctuating market conditions uncommon even in the volatile gas industry, a type of contract no longer in use, and a large discovery seldom replicated. But merely because a case is not likely to arise again should not prevent the law from being fairly applied to the situation as it actually occurred. In this instance, I believe the law permits Tennessee to attempt to prove that Sellers' increased tender of gas either occurred in bad faith or was unreasonably disproportionate to prior output. Therefore, I would affirm the court of appeals' judgment in all respects.

9. Tennessee made a partial summary judgment motion seeking a ruling that the GPA was an output contract governed by section 2.306. Tennessee specifically argued that the GPA agreement "meets the definition of an output contract as the contract quantity is indefinite and is measured by the future output (delivery capacity) of the seller." Lenape, in its brief in response, argued that the GPA was not an output contract because it requires Tennessee to purchase the entire production of gas from specified acreage. Tesoro and Coastal also filed a summary judgment motion, joined by Lenape, which sought a ruling by the court that the GPA was not an output contract subject to 2.306. Their brief contained arguments that the GPA was not an output contract and that, even if it was, it is not governed by section 2.306. Without specifying the grounds of its decision, the trial court denied Tennessee's motion and granted Tesoro and Coastal's motion.

During opening statements (before the Hon. Charles W. Barrow, retired Justice of this Court, sitting by designation), counsel for Tennessee, after indicating to the court that various claims had been voluntarily dismissed by the parties, stated:

The only thing left in this case is a previous judge [the Hon. Carlos C. Cadena, retired Chief Justice of the Fourth Court of Appeals, sitting by designation] in a grant of summary judgment had *knocked out our right to claim that this was [a]n output contract.* The output section of the Uniform Commercial Code imposes a good faith obligation upon the parties. We have preserved that if on appeal some-

where up the line that is reversed and sent back for trial on the output question, that whatever bad faith claims or good faith claims we might have under solely the output section of the Uniform Commercial Code is preserved. (Emphasis added.) Given the summary judgment rulings and this statement to the judge, which went unchallenged by counsel for the Sellers, I believe that the parties and the court proceeded to trial under the assumption that the court had effectively ruled that the GPA was not an output contract.

10. The record supports this conclusion. During the opening and closing statements of the trial, none of the parties identified bad faith increase in delivery capacity or output as an issue to be tried or in any way attempted to link (or not) the increase in output with market price changes for gas. Moreover, the only explicit question about "good faith" posed to a witness during the trial was in regard to Lenape's duty as a lessee to its lessors to pool in good faith. During cross-examination by Tesoro and Coastal, Mr. Devine, senior vice president for Lenape Resources, testified that he was aware that an operator is required to pool in good faith, and that in his opinion the two new units in question were formed in good faith "as far as the oil and gas leases are concerned." But, of course, any duty owed by Lenape to its lessors is not at issue in this case. Thus, from this review of the record, I conclude that the issue of whether the complained-of increase in output occurred in good faith has not been tried.