**MJCM, LLC, Plaintiff,**

**v.**

**FIRST GEORGIA BANK, INC., Defendant**

**No. H–04–1310.**

United States District Court, S.D. Texas, Houston Division.

May 12, 2005.

Matthew Luke Hoeg, Andrews & Kurth et al., Houston, TX, for Plaintiff.

Bradley Lane DeLuca, Johnson Finkel et al., Susan LeGrand Read, Attorney at Law, Houston, TX, James F. Bogan, III, Kilpatrick Stockton LLP, Atlanta, GA, for Defendants.

## MEMORANDUM OPINION AND ORDER

HOYT, District Judge.

## I. INTRODUCTION

Pending before this Court are cross motions for summary judgment. The plaintiff, MJCM, LLC d/b/a Pinnacle Financial Strategies (hereinafter "Pinnacle"), filed its motion for summary judgment (Docket No. 22) seeking compensation for an alleged breach of contract by the defendant. The defendant, United Community Banks, Inc. (successor-in-interest to First Georgia Bank, Inc.) (hereinafter "FGB") filed its motion for summary judgment that it did not breach the contract.

The suit revolves around a contract for professional services in the banking industry. FGB entered into a 30–month contract for one of the plaintiff's service programs. Four months into the contract United Community Banks, Inc. acquired First Georgia Bank, and the new entity considered and treated the contract as terminated by the merger. The plaintiff demanded additional termination fees according to section 12 of the contract. The defendant refused and this litigation ensued.

After considering the motions, responses, the pleadings, and the applicable law, this Court determines that the plaintiff's

motion should be DENIED and the defendant's motion should be GRANTED.

## II. FACTUAL BACKGROUND

The plaintiff develops and provides services, programs, and products to financial institutions. One of these programs, the overdraft protection program ("the program"), allows banks to permit depositors to overdraft their accounts without having their checks returned, in exchange for a fee paid by the depositor. On August 27, 2002, the defendant entered into a 30–month contract [1] for the program ("the contract"), which provided for training, support, marketing, and software installation. One of the terms of the contract calls for the determination of a "baseline," which is an agreed upon estimation of monthly revenues from overdraft fees received by the defendant before beginning the program. After installation of the program, the plaintiff receives 20 percent of the monthly fees generated above the baseline.

At the center of this litigation are two sections of the contract. The sections read as follows, with relevant portions bolded and italicized:

**11. Assignment.**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, legal representatives, and assigns where permitted by this Agreement; *provided, however,* that the Client shall not be entitled to assign this Agreement, or allow any person, entity or group, including its affiliates, [sic] use or have the benefit of the Program, the Services or the Software except for the entities disclosed on *Exhibit D and if a change in*

---

**1.** The 30–month term begins from the "implementation" stage, which began around January ary 2003.

*control in ownership occurs, the Client will pay the fees described in Exhibit C and this Agreement and all rights of Client hereunder shall terminate.*

**12. Term; Termination.**

The term of this Agreement shall be effective with execution of the Agreement and shall expire on the last day of the *30* month following the first full calendar month of Program implementation. This Agreement shall also terminate as provided in Sections 1(a) or 3, upon the termination of either of the Licenses, or if Client breaches this Agreement and fails to cure such breach within thirty (30) days after Pinnacle gives notice of such breach.

*If this Agreement is terminated for any reason,* Pinnacle shall be (a) entitled to retain a ten thousand dollar ($10,000) non-refundable retainer referenced on *Exhibit C,* (b) reimbursed for any cost or expenses incurred by Pinnacle through the date of termination, (c) if the parties have agreed upon a Baseline prior to termination hereof, paid by Client an amount equal to twenty-five percent (25%) of such baseline for each month remaining under this Agreement. Termination of this Agreement shall not affect this Section 12 or Sections 4, 5, 6, 7, 8, 9, 14, 15 and 16.

Both parties performed under the agreement until April of 2003, when United Community Bank acquired the defendant. The defendant wrote a letter to the plaintiff describing the merger, and took the position that the merger constituted a "change in control" and that the contract would terminate pursuant to section 11. The plaintiff responded to the termination letter and took the position that the termination of the agreement would require payments in accordance with section 12 of the agreement totaling $898,950.00. The defendant disagreed with the plaintiff's interpretation of the contract, but agreed to pay, and in fact and did pay, those fees outlined in Exhibit C to the contract pursuant to section 11.

### III. CONTENTIONS OF THE PARTIES

The plaintiff contends that it is entitled to all payments under section 12 of the contract because section 12 contains the phrase "If this Agreement is terminated for any reason." It claims that FGB's merger did not constitute a "change in control of ownership" as contemplated by section 11, and even if the merger did constitute a change in ownership, section 12 continues to apply. Under this interpretation, the plaintiff should receive, among other expenses, twenty-five percent of the agreed baseline for each month remaining under the contract.

The defendant contends that FGB experienced a change in control of ownership and that section 12 applies only to the particular types of terminations outlined in the first paragraph of the section. Further, FGB claims that section 11 provides for an "automatic" termination upon change in ownership that does not trigger section 12. The defendant suggests that the plaintiff's interpretation would render the phrase "if a change in control in ownership occurs, the Client will pay the fees described in *Exhibit C* and this Agreement" in section 11 superfluous, because section 12 specifies exhibit C as one of the sources for calculating fees. Furthermore, the defendant highlights the fact that sections 1(a) and 3 specifically refer to termination "in accordance with section 12," whereas section 11 does not, thus indicating intent not to connect section 11 with section 12. Finally, the defendant contends that the plaintiff drafted the contract and that any ambiguities should thus be resolved in the defendant's favor.

## IV. STATEMENT OF THE LAW

### A. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to . . . judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings" and designate "specific facts" in the record "showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. Throughout the analysis, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See id.* at 247–49, 106 S.Ct. 2505. A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists. *See Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991).

### B. Contract Interpretation

■ The contract specifies that Texas law governs. In Texas, as elsewhere, rules of contract interpretation can be divided into two categories: primary and secondary. Primary rules apply to all contract language, whereas secondary rules apply only when a phrase is ambiguous. 11 Williston on Contracts § 32:1 (4th ed.2000). The primary rules of interpretation direct a court 1) to determine and give effect to the intent of the parties, *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996); 2) to consider the entire contract and give effect to all portions of the contract, *Id.*; 3) generally to give words their ordinary meaning, unless it appears that the intent of the parties would be defeated thereby, *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985); and 4) to interpret contracts in light of the circumstances at the time the contract was drafted, *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996).

Applying the primary rules of construction, if a contract term or phrase has a definite legal meaning or interpretation, then it is not ambiguous and should be construed as a matter of law. *Texas Farm Bureau Mut. Ins. Co. v. Sturrock*, 146 S.W.3d 123, 126 (Tex.2004). Whether a contract is ambiguous is a question of law. *Id.* While parties may offer differing interpretations of a contract, ambiguity only arises if a contract may be read under more than one reasonable interpretation. *Id.* If a contract term is ambiguous, secondary rules of interpretation aid in ascertaining the appropriate meaning. Williston, *supra*, § 32:1.

## V. APPLICATION OF THE LAW

■ The first issue before the Court is whether the merger of FGB to United Community Banks brought about a "change of control in ownership" as provided for in section 11 of the contract. The defendant cites to statutory authority providing that the type of transaction in this case represents a change in control. Furthermore, the defendant's expert reported

that the transaction "conclusively constituted a change in control in ownership of FGB." The expert's statements regarding FGB's merger with United Community Banks are unrebutted. Mere assertions on the part of the plaintiff are insufficient to survive summary judgment scrutiny. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

■ Having concluded that the defendant experienced a change in control in ownership under section 11, the Court now considers whether the cancellation of the contract under the "change in control of ownership" provision of section 11 obligates the defendant to pay all of the fees outlined in section 12 of the contract. The Court must first ascertain the meaning of the phrase "for any reason" in section 12 of the contract.

In the context of section 12, the phrase "for any reason" is susceptible to multiple reasonable meanings. The last sentence of the first paragraph of section 12 enumerates specific instances of termination, including those in accordance with sections 1(a) and 3, and includes a catch-all phrase "or if the Client breaches this Agreement." It is unclear whether the phrase "for any reason" refers to the termination events listed in the preceding paragraph, or whether it means any reason under the sun.

The Court is of the opinion that the phrase "for any reason" refers to the preceding paragraph, including the specific events under sections 1(a) and 3, as well as the catch-all phrase "or if the Client breaches this Agreement." To read it as broadly as the plaintiff desires would allow the plaintiff to recover all remuneration listed in section 12 even if the *plaintiff* breached the contract and caused its termination. However, because the phrase "for any reason" can reasonably be read in multiple ways, the Court considers it ambiguous and will seek to interpret it using the appropriate tools of interpretation.

The contract contains three specific references to ending the business relationship in section 1(a), 3, and 11. Section 1(a) concerns determining a "baseline" figure by which to measure increased profits, and concludes with the sentence, "If the parties do not agree on a Baseline within such thirty (30) day period, this Agreement shall terminate in accordance with Section 12." Section 3 describes the client's "program coordinator" as a person who acts as a liaison between Pinnacle and the client. The client program coordinator must agree to proposals offered by Pinnacle, and concludes with language similar to that in section 1(a): "If any such proposal is disapproved ... this Agreement will terminate in accordance with Section 12."

The concluding language of section 11 differs significantly from that of section 1(a) and 3. It reads, "if a change in control in ownership of the Client occurs, the Client will pay the fees described in *Exhibit C* and this Agreement and all rights of Client hereunder shall terminate." Whereas sections 1(a) and 3 contain specific references to Section 12, section 11 contains a specific reference only to exhibit C. Moreover, instead of using the language "this Agreement will terminate," the language in section 11 states "all rights of Client hereunder shall terminate."

The specific reference in section 11 to exhibit C is significant not only because it contrasts the language used in the other quoted sections, but also because exhibit C is one of the provisions in section 12. As the defendant points out, if section 12 applied to termination under section 11, then the reference to exhibit C is superfluous. Reading the contract as a whole, and giving meaning to the specific word choices used in the contract, the Court concludes that termination under section 11 does not

bring into play section 12. *See Lenape Res.*, 925 S.W.2d at 574.

The defendant also argues that the phrase "for any reason" should be limited under the doctrine of *ejusdem generis*. The doctrine teaches that a specific clause controls a more general one. *Ejusdem generis* applies "where there is an enumeration or listing of specific things, followed by more general words relating to the same subject matter, in which case the general words are interpreted as meaning things of the same kind as the specific matters to which the parties refer." Williston 32:10; *see also Hilco Elec. Coop. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex.2003); *R & B Falcon Corp. v. American Exploration Co.*, 154 F.Supp.2d 969, 974–75 (S.D.Tex.2001). The doctrine is closely related to the policy of reading a contract as a whole and simply reflects the fact that passages in close proximity should be read as congruously as possible.

Despite the arguments of counsel, section 12 of the contract is not a perfect candidate for the application of the doctrine. The defendant reads the first paragraph of section 12 as the "listing of specific things," and the phrase "If this Agreement is terminated for any reason" as the "more general words" (applying Professor Williston's terminology). However, as already alluded to, the first paragraph of section 12 actually contains both specific and general terms. The specific terms are 1) the expiration of the 30 months, 2) section 1(a), and 3) section 3, while the general term is represented by the phrase "or if the Client breaches this Agreement." Although the first paragraph is not technically a list of "specific" items, the doctrine maintains much of its applicability. The words and phrases, as well as their organization, suggest that the parties intended to separate sections 11 and 12.The defendant also highlights the

omission of a cross reference between sections 11 and 12, citing the doctrine of "expressio unius est exclusio alterius" ("the naming of one thing excludes another"). That doctrine teaches that when specific things are listed together, and one thing that could have been listed in that group is omitted, the omission is purposeful. *See CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 734 S.W.2d 653, 655 (Tex.1987). Hence, the omission of a reference in section 12 to terminations under section 11 indicates an intent to separate a "change in control of ownership" from other types of terminating events.

In summary, the phrase in section 12 to "termination for any reason" does not include a termination due to a change in control of ownership. Rather, the phrase more naturally appears to mean "any of the above reasons," referring to those reasons in the preceding paragraph. To read it otherwise would ignore the different word choices among the sections and render the first paragraph of section 12, as well as the cross-references in sections 1(a) and 3, as superfluous.

## VI. CONCLUSION

For the reasons stated, the Court finds that the defendant's motion for summary judgment should be and is GRANTED, and the plaintiff's motion for summary judgment is DENIED.

It is so ORDERED.