COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-374-CV

 

 

BOB R. BARNARD AND NATIONAL                                       APPELLANTS

DOOR INDUSTRIES, INC.

 

                                                   V.

 

WESTERN STRATEGIC ADVISORS, LLC                                   APPELLEES

 

                                              ------------

 

            FROM THE 96TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. Introduction

In eight issues, Appellants Bob Barnard and
National Door Industries appeal the summary judgment granted in favor of
Appellees Western Strategic Advisors.  We reverse and remand.

 








II. Factual and Procedural History

National Door Industries (ANDI@) is a
manufacturer and distributor of products to the garage door industry.  NDI is owned by Bob Barnard and his three
sons, Mike, Ken, and Britt Barnard.  Bob
Barnard (ABarnard@) is the
majority shareholder and chief executive officer of NDI.  In 2004, the Barnards decided to sell NDI and
sought help from Western Strategic Advisors (AWestern@) with
regard to locating a buyer and negotiating the terms of the sale.  Western is an investment banker and business
broker involved in the acquisition and sale of companies.         

On July 13, 2004, Barnard and NDI signed an
Engagement Agreement with Western in which Western agreed to provide its
services in return for NDI=s
promise to pay Western a four percent commission of the sales price if Western
located a purchaser who actually bought NDI. 
In addition, the engagement agreement provided that Western could
recover a one percent consulting fee, but only Ain the
event a letter of intent has been signed and, for whatever reason, the
Seller and Company decide not to complete the sale at the agreed upon terms of
the letter of intent.@ 








Western located a potential purchaser for NDI,
Bolder Capital, LLC (ABolder@).  On September 8, 2004, Bolder sent NDI a
signed letter of intent for the purchase of NDI.  Bolder offered to purchase NDI for $52
million.  The letter of intent expressly
stated that Aits terms [were] not legally
binding on either party.@ 
Barnard and NDI signed Bolder=s letter
of intent on September 24, 2004.  Bolder=s letter
of intent outlined twelve conditions that had to be met before the deal to
purchase NDI could close.  One of the
conditions, AExecutive Management
Consideration,@ provided that NDI=s
president, Jim Lewis, and vice-president, Rick Smith, could continue to manage
NDI and acquire an ownership interest.  








On October 14, Bolder=s
managing directors, Todd Hamilton and Ward McNally, traveled to Fort Worth to
visit the NDI plant.  They toured the
plant and met with NDI=s president and vice-president,
as well as Western=s president, Don Woodard.  At this meeting Bolder announced that it had
found nothing that would prevent it from completing the transaction according
to the terms contained in the letter of intent. 
After the meeting, NDI President Jim Lewis told Western=s Don
Woodard that Barnard Adidn=t come
away from the meeting with good feelings@ because
Barnard didn=t feel that Bolder was treating
Jim Lewis and Rick Smith fairly regarding Bolder=s
proposed executive compensation package. 
After the October 14th meeting, Western began to have difficulty
communicating with NDI.  Woodard claimed
that NDI cancelled several meetings on short notice.[2]

By late November 2004, four of the twelve
conditions remained unresolved between the parties.  On November 17, Jim Lewis sent an email to
Bolder confirming that he had received the proposed executive compensation contracts
and that he and Rick Smith would consult with their attorneys about the
contracts.  On November 20, Jim Lewis
sent an email to Chuck Milliken, NDI=s
attorney, stating that Barnard had expressed his concern that he was not comfortable
with the transaction at that point. 
Based on Barnard=s instruction, Lewis told
Milliken to Ataxi up and hold until [Lewis]
and Rick Smith had a meeting with their attorneys.@  Barnard testified that this order meant that
Milliken was to stop working on the written agreements until Lewis and Smith
met with their attorneys and until NDI and Bolder could finalize the details
regarding the unresolved conditions. 
After this, all of Bolder=s
attempts to contact NDI went unanswered.








On December 20, 2004, Western=s
president, Don Woodard, sent a letter to Barnard warning him that he and NDI
were jeopardizing the deal by acting in a manner that could be interpreted as
if they did not want the deal to close. 
Western demanded that NDI take immediate action to settle the unresolved
conditions.  Barnard responded to Woodard=s letter
by telling him that Awe would get things worked out.@ 

On January 8, 2005, Bolder sent a letter to NDI
withdrawing its letter of intent for the purchase of NDI.  Bolder gave two reasons for why it was
withdrawing its letter of intent: (1) weak communication, which had caused the
process of closure to be slow, and (2) the fact that the parties had reached
the end of their 120-day exclusivity period.[3]

Ten days after Bolder withdrew from the
negotiations, Western sent a demand letter to NDI seeking to recover its one
percent consulting fee pursuant to paragraph five of the engagement
agreement.  NDI refused to pay the
consulting fee on the grounds that it was not the party who decided to end the
negotiations.  








Two months after Bolder withdrew the letter of
intent, Western sued NDI and Barnard for breach of contract.  Western moved for summary judgment under the
theory that NDI breached its contract when it failed to pay Western a one
percent consulting fee.  Western argued
that the letter of intent contained terms to which both parties agreed, and
that NDI decided not to complete the sale on those agreed terms.  The trial court granted the motion and
awarded $520,000 (one percent of the $52 million sales price), pre-judgment
interest, and attorney=s fees to Western.  NDI filed a motion for new trial, which was
overruled by the trial court.  NDI then
brought this appeal. 

III. Standard of Review

In a summary judgment case, the issue on appeal
is whether the movant met the summary judgment burden by establishing that no
genuine issue of material fact exists and that the movant is entitled to
judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Sw. Elec.
Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of Houston v.
Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all
doubts about the existence of a genuine issue of material fact are resolved
against the movant.  Sw. Elec. Power
Co., 73 S.W.3d at 215.








When reviewing a summary judgment, we take as
true all evidence favorable to the nonmovant, and we indulge every reasonable
inference and resolve any doubts in the nonmovant=s favor.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005).  Evidence
that favors the movant=s position will not be
considered unless it is uncontroverted.  Great
Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47
(Tex. 1965).  If the uncontroverted
evidence is from an interested witness, it does nothing more than raise a fact
issue unless it is clear, positive and direct, otherwise credible and free from
contradictions and inconsistencies, and could have been readily
controverted.  Tex. R. Civ. P. 166a(c); Trico Techs. Corp. v. Montiel,
949 S.W.2d 308, 310 (Tex. 1997).   But we
must consider whether reasonable and fair-minded jurors could differ in their
conclusions in light of all of the evidence presented.  See Wal-Mart Stores, Inc. v. Spates,
186 S.W.3d 566, 568 (Tex. 2006); City of Keller v. Wilson, 168 S.W.3d
802, 822-24 (Tex. 2005).

The summary judgment will be affirmed only if the
record establishes that the movant has conclusively proved all essential
elements of the movant=s cause of action or defense as
a matter of law.  Clear Creek Basin,
589 S.W.2d at 678.

IV. Whether NDI ADecided
Not to Complete the Sale@

The focal point of this case evolves from the
issue of whether affidavit  testimony
that conflicts with objective evidence creates a fact question which would preclude
summary judgment. 

A. Decision Not to Complete the Sale 








When conflicts between the nonmovant=s
affidavit testimony and the objective facts arise, the conflict must be
resolved in the nonmovant=s favor. See Davis v.
Grapevine, 188 S.W.3d 748, 756 (Tex. App.CFort
Worth 2006, pet. denied) (holding that when conflicting inferences may be drawn
between a party=s summary judgment affidavit and
his deposition on matters of material fact, a fact issue is presented).  

Here, NDI argues that a genuine issue of material
fact exists regarding whether Barnard and NDI ever decided not to complete the
sale.  In support of its claim, NDI filed
several affidavits in which various individuals testified that they wanted the
sale of NDI to go through.  First, Bob
and Britt Barnard both stated that they intended to go through with the
sale.  Next, NDI points to Mike Barnard=s
testimony that he wanted to sell NDI. 
NDI then highlights testimony from Jim Lewis and Mike Barnard, who each
testified that no board meeting was ever held at which NDI formally decided not
to complete the sale.  Finally, NDI
directs the court to Bob Barnard=s
testimony in which he denied ever deciding not to sell NDI.  NDI argues that this witness testimony
demonstrates that NDI and Barnard never decided not to complete the sale;
therefore, a genuine issue of material fact existed and summary judgment was
improper. 








In contrast, Western points out that the
objective evidence demonstrates that NDI and the Barnards put forth minimal
effort to ensure that the negotiations went forward and therefore is indicative
of their decision not to complete the sale. 
For instance, Woodard testified that after the October meeting between
NDI and Bolder representatives, he began to have difficulty communicating with
NDI.  He stated that Barnard and Jim
Lewis did not return his phone calls and claimed that it became increasingly
difficult to get meetings scheduled.  At
Barnard=s
direction, Lewis then issued the Ataxi up
and hold@
instruction on November 20, 2004, thus preventing NDI=s
attorney from communicating with Bolder=s attorneys
regarding negotiation of the executive compensation packages or any other
matters.  Woodard testified that Bolder=s
president, Todd Hamilton, repeatedly contacted him to complain that he was
getting no response from NDI.  Woodard
then sent Jim Lewis an email encouraging him to contact Bolder and resume
discussions.  Despite this encouragement,
communication was not reestablished between NDI and Bolder.  Eventually, Bolder withdrew its letter of
intent, citing weak communication as a primary reason for its withdrawal.








A review of the evidence shows that while NDI
presented affidavits supporting its position that NDI and the Barnards never
decided not to complete the sale, the affidavits are in direct conflict with
the objective facts.  Although all of the
testimony may seem rather incredible in light of NDI=s
actions, we are bound by the precedent of this court, so for purposes of
summary judgment  we resolve the conflict
between the affidavits and the objective facts in favor of NDI, the nonmovant.  See Davis, 188 S.W.3d at 756 (holding that
when conflicting inferences may be drawn between a party=s
summary judgment affidavit and his deposition on matters of material fact, a
fact issue is presented).  Therefore, we
hold that the affidavit testimony raised an actual fact issue.  Id.

B. Western=s Theory
of Prevention

Western also contends that if this court
determines that a fact issue exists regarding whether NDI Adecide[d]
not to complete the sale,@ the summary judgment should
still be upheld because NDI=s
conduct prevented Acomplet[ion] [of] the sale.@[4] 

In evaluating Western=s
contention, we examine paragraph five of the engagement agreement, which states
that Western can only recover a one percent consulting fee Ain the
event a letter of intent has been signed and, for whatever reason, the
Seller and Company decide not to complete the sale at the agreed upon terms of
the letter of intent.@ 








In construing a written agreement, such as an
engagement agreement, a court must strive to give meaning to each
provision.  See Lenape Res. Corp. v.
Tenn. Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996).  To achieve this objective, courts should
examine and consider the entire writing in an effort to harmonize and give
effect to all the provisions so that none will be rendered meaningless.  Coker v. Coker, 650 S.W.2d 391, 393
(Tex. 1983).  A court should construe a
written contract from a utilitarian standpoint, bearing in mind the particular
business activity sought to be served.  Lenape
Res. Corp., 925 S.W.2d at 574.








Despite Western=s
assertion that the summary judgment may be upheld on the theory of prevention,
our review of the evidence shows otherwise. 
Under the plain language of the engagement agreement, the only issue
that matters in evaluating whether Western is entitled to the consulting fee is
whether NDI and Barnard Adecide[d] not to complete the
sale at the agreed upon terms of the letter of intent.@  If we were to construe the engagement
agreement to allow Western to recover the consulting fee by merely proving
prevention, Western would no longer be required to prove that NDI and Barnard Adecide[d]
not to complete the sale,@ and a portion of the engagement
agreement would be rendered meaningless.  See Coker, 650 S.W.2d at 393.  Furthermore, logic tells us that before NDI
and Barnard could have prevented the sale from being completed, they must have
first decided not to complete the sale. 
We have already determined that NDI and Barnard have shown that Western
did not conclusively establish that NDI and Barnard Adecide[d]
not to complete the sale.@ 
And even though Western has presented some evidence that indicates that
NDI and Barnard=s actions could have prevented
negotiations from progressing, under the terms of the engagement agreement
Western is not entitled to recover a consulting fee unless it proves that NDI
and Barnard Adecide[d] not to complete the
sale.@  Western has failed to do this.  Therefore, for purposes of our summary
judgment review, we reject Western=s
prevention argument.  

V. Conclusion

Because
NDI has raised a genuine issue of material fact regarding whether Barnard and
NDI ever Adecide[d] not to complete
the sale,@ we hold that the summary
judgment was improperly granted.  Accordingly,
we reverse the summary judgment and remand this case to the trial court for
further proceedings.         

 

 

BOB MCCOY

JUSTICE

 

PANEL A:   HOLMAN, GARDNER, and
MCCOY, JJ.

 

DELIVERED: January 31, 2008











[1]See Tex.
R. App. P.
47.4.





[2]The record does not
reflect how many meetings were cancelled or how much notice NDI gave when it cancelled
the meetings. 





[3]Bolder actually withdrew
the letter of intent two weeks before the exclusivity period ended. 





[4]Western asserts that NDI
and Barnard took three actions that made it impossible for the sale to
occur.  First, they told their lawyer to Ataxi up and hold,@ and they never withdrew
the instruction.  Second, Lewis and Smith
failed to meet with their attorneys, and this kept the executive employment
contract from being finalized.  Third,
NDI and Barnard did not respond to the request to extend the exclusivity
period, and Bolder could not continue without a guarantee of exclusivity.