# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 9, 2023

Lyle W. Cayce
Clerk

_____

No. 22-50769

_____

Wesdem, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Illinois Tool Works, Incorporated, *doing business as* ITW
Evercoat,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-987

_____

Before Smith, Higginson, and Willett, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

This case involves a contract dispute between an automobile-product manufacturer and one of its distributors. The distributor, plaintiff-appellant Wesden, LLC,[1] appeals the district court's Rule 12(b)(6) dismissal of its

_____

[1] There is some degree of confusion about plaintiff's name. Plaintiff filed suit in state court as "Wesdem, LLC" and maintained that spelling once in federal court. The case caption in the district court therefore said "Wesdem." At some point in the litigation, plaintiff started referring to itself as "Wesden." The district court noted that the parties were using both "Wesdem" and "Wesden," but that it "appear[ed] that 'Wesden' [wa]s

No. 22-50769

fraud claim and summary-judgment dismissal of its breach-of-contract claim against the manufacturer, defendant-appellee Illinois Tool Works, Inc. d/b/a ITW Evercoat ("ITW"). For the following reasons, we AFFIRM.

## I.

Wesden alleges as follows in its first amended complaint and its attachments. ITW manufactures a line of automobile products called "Auto Magic." On September 5, 2018, ITW's "Zone Manager," Skip Wier, met with Troy Breeden, the owner of Wesden, to discuss the possibility of Wesden's becoming a distributor of Auto Magic products by purchasing an existing distributor, Texas Auto Products ("TAP"). At the time, TAP had been selling Auto Magic products through Amazon.

Wesden alleges that, at the meeting, Wier "gave Mr. Breeden assurances" that, if Wesden purchased TAP and began distributing ITW's products, Wesden "could continue to sell [ITW]'s products through Amazon and other similar companies for as long as it wanted." Wesden further alleges that Wier told Breeden that ITW "would never stop [Wesden] from developing its markets to sell [ITW]'s products, and that [Wesden] could sell to any customer, including Amazon." Wier allegedly "promised" that ITW would "never steal [Wesden]'s markets and/or clients, nor would it hamper [Wesden]'s future growth through e-commerce marketplaces such as Amazon, if [Wesden] sold to customers through third party e-commerce marketplaces" like Amazon.

―――――――――――――――――

the Plaintiff's legal name." The district court thereafter used "Wesden." But then, plaintiff filed its notice of appeal as "Wesdem." The case caption in this court therefore says "Wesdem." But both parties tell us in their briefs that plaintiff's name is Wesden. We therefore use "Wesden."

2

No. 22-50769

Wesden purchased TAP for $250,000 and became a distributor for ITW. On October 24, 2018, Wier sent Breeden an email, which, according to Wesden, "stated in writing the substance of the [p]arties' [a]greement." Wier's email to Breeden said:

> Troy,
>
> It finally happened, we got approval. Your account number is 101140. Our credit manager is on the conservative side. He has given you a credit limit of $10K until he sees a credit history pattern. Your terms are net 30 days. . . . Thank you for joining the Auto Magic family and I apologize for taking so long to get this done.

For almost two years after this approval, Wesden sold Auto Magic products, including through online marketplaces like Amazon.

The parties' dispute began in the summer of 2020, when ITW sent a notice to its distributors "announcing and implementing" an "Authorized Distributor Program," as described in an attached policy. In the notice, ITW told its distributors that the policy "prohibits sales of Auto Magic products [on] any online marketplace, such as Amazon, eBay or Walmart, without [ITW's] prior written consent."[2]

Wesden immediately requested permission to continue to sell through online marketplaces but was denied. On July 14, 2020, Wier emailed Breeden the "response" from ITW's home office. ITW explained:

> The management team believes the value of the distributors is to train, educate and sell product to end-users in their

---

[2] The attached policy included this prohibition in bold letters, telling distributors: "You shall not offer for sale or sell Products on or through any website, online marketplace (including, but not limited to, Amazon, eBay, or Walmart Marketplace), mobile application, or other online forum other than a Permissible Website without the prior written consent of ITW Evercoat."

No. 22-50769

> geographic area.  The intent is not for a distributor to compete on a national basis through an internet platform. . . .  This agreement will impact a few of our distributors but will protect the majority of the distribution base.  It is with this background an exception will not be granted.

After relaying this correspondence from ITW, Wier said to Breeden, "I have some thoughts on how we might get around some of this.  I'll give you a call in the morning to discuss."

Wier and Breeden were not able to "get around" the prohibition.  On July 29, 2020, Wesden sued ITW in Texas state court, alleging breach of contract and other related claims.  On August 21, 2020, ITW removed the case to federal court, invoking diversity jurisdiction under 28 U.S.C. § 1332.[3] ITW then moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Wesden filed an amended complaint, adding a claim for fraud on the basis of Wier's alleged representations at the initial September 2018 meeting.  ITW moved again for 12(b)(6) dismissal of all claims.

---

[3] In the district court, both parties made the common mistake of alleging Wesden's citizenship based on its principal place of business.  But Wesden is an LLC, whose citizenship is determined not by its business operations but instead by the citizenship of all of its members. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008).  On appeal, the parties were instructed to address whether complete diversity exists.  Defective jurisdictional pleadings may be amended, even on appeal.  28 U.S.C. § 1653; *Burdett v. Remington Arms Co.*, 854 F.3d 733, 734 n.1 (5th Cir. 2017); *Warren v. Bank of Am., N.A.*, 717 F. App'x 474, 475 n.4 (5th Cir. 2018).

In its brief, ITW directs us to record evidence that Wesden's sole member is Troy Breeden, and that Breeden is a citizen of Texas.  ITW properly alleged in the district court that it is a citizen of Delaware and Illinois.  Wesden does not contest ITW's allegations on appeal or otherwise dispute that Breeden is a citizen of Texas.  We are therefore satisfied that the parties are completely diverse. *See id.*

No. 22-50769

On March 12, 2021, the district court granted ITW's motion in part, dismissing Wesden's claims for promissory estoppel, unjust enrichment, fraud, and tortious interference. Relevant here, the court found that Wesden failed to state a claim for fraud because its allegations did not support an inference (i) that ITW had no intention of performing on its promise at the time Wier made his statements to Breeden, or (ii) that Wier knew his statements were false or that he spoke with recklessness as to their truth. The court denied ITW's motion to dismiss as to Wesden's breach-of-contract claim, explaining that ITW's arguments depended on further record development and that Wesden's allegations were sufficient to survive past the pleadings stage.

Following discovery, ITW moved for summary judgment on Wesden's breach-of-contract claim. Based on the summary-judgment record, the district court granted ITW's motion in full, explaining that, while the parties had entered into "*some* type of agreement," the agreement was unenforceable under Texas's statute of frauds. Judgment was entered in favor of ITW.

Wesden now appeals, contending that the district court erred in (i) dismissing its fraud claim under Rule 12(b)(6) and (ii) granting summary judgment for ITW on the breach-of-contract claim. Wesden contends that the 12(b)(6) dismissal of its fraud claim was improper because it had plausibly alleged that ITW wanted to learn Wesden's "online strategy" so it could "eventually cut the middleman . . . out to capture greater profits." Wesden further argues that summary judgment on its breach-of-contract claim was improper because there remain material fact disputes as to key terms in the contract.

We address each argument turn.

5

No. 22-50769

## II.

We first take up Wesden's fraud claim.  We review a district court's 12(b)(6) dismissal of a claim *de novo*, accepting all well-pleaded facts as true and viewing them in the light most favorable to the plaintiff.  *Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010) (citations omitted).  The plaintiff's complaint must contain "factual matter" that, if accepted as true, is sufficient to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  When a plaintiff alleges a claim of fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires that the plaintiff "state with particularity the circumstances constituting [the] fraud."  Fed. R. Civ. P. 9(b).

Texas law governs Wesden's fraud claim in this diversity case. *McBeth v. Carpenter*, 565 F.3d 171, 176 (5th Cir. 2009) (citation omitted).  A fraud claim under Texas law requires that

> (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury.

6

No. 22-50769

*Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019) (citation omitted).[4]  Wesden has recited all of these elements in its complaint.

The issue here reduces to the plausibility of Wesden's fraud claim. Construing the complaint in Wesden's favor, the claim is that, at the September 2018 meeting, ITW promised Wesden that it could sell Auto Magic products through online marketplaces like Amazon and that ITW would not stop Wesden from doing so or otherwise appropriate those online markets for itself.[5]  But this representation was false, and ITW knew it was false, or was at least reckless as to its truth, when it made the representation. ITW made this misrepresentation "to induce [Wesden] into trusting

---

[4]  The Texas Supreme Court listed these elements in describing a fraudulent-inducement claim, but fraudulent inducement is "a species of common-law fraud" that, importantly, shares these same basic elements. *Int'l Bus. Machs. Corp.*, 573 S.W.3d at 228 (quoting *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018)); *see, e.g.*, *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (listing an abbreviated version of these elements as comprising a claim for common-law fraud); *Ernst & Young, LLP v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (same).

[5]  The district court disregarded the alleged "misrepresentations" that were vague or indefinite and thus not cognizable as the basis of a fraud claim.  We do the same.  For example, Wesden may not maintain a fraud claim based on ITW's alleged representations that ITW "would treat [Wesden] as a family member" or that "[d]istributors were the life blood of [ITW]'s business and [ITW] w[ould] always support the Distributor."  *See Gilmartin v. KVTV-Channel 13*, 985 S.W.2d 553, 558-59 (Tex. App.—San Antonio 1998) (affirming the dismissal of a fraud claim because there were no "promises or assurances specific or definite enough upon which reliance c[ould] be reasonably made"); *Glob. Integrated Bldg. Sys. v. Target Logistics, LLC*, No. 06-2637, 2009 WL 259360, at *8 (S.D. Tex. Feb. 3, 2009) ("In proving justifiable reliance in a claim for fraud . . . , the alleged representation relied upon cannot be vague and indefinite." (citing Texas cases)).

Setting aside the allegations of ITW's vague assurances, and accounting for the duplicative overlap across the other alleged representations, Wesden's complaint alleges one essential false promise: that ITW would not stop Wesden from selling Auto Magic products through online marketplaces.  It is this theory that we take up in assessing the fraud claim's dismissal under Rule 12(b)(6).

[ITW]" so that Wesden "would become a distributor . . . to increase [ITW]'s profit and stock price," only so it could later "breach [its] contract[] with the distributor[] and reap the benefit of the distributor['s] efforts and expense."

Our role at the 12(b)(6) stage is to determine whether this is plausible. To this end, we must determine whether Wesden's complaint contains "factual content" that allows us to "draw the reasonable inference" that ITW committed fraud as alleged. *See Iqbal*, 556 U.S. at 678. Recognizing that this is a "context-specific task that requires [us] to draw on [our] judicial experience and common sense," *id.* at 679, we conclude that Wesden's complaint does not permit a reasonable inference of fraud.

Fatally, Wesden's alleged facts do not support the inference that (i) ITW's representation was false and (ii) it knew it was false when made. The alleged misrepresentation was a promise of *future* performance, and in Texas, "[a] promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (quoting *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)).

Wesden's alleged facts do not allow us to reasonably infer that, in September 2018, ITW had "no intention" of adhering to its promise to permit Wesden's sales on Amazon and similar marketplaces. *See id.* While Wesden alleges that the promise was false and that ITW knew it was false, these conclusory allegations are "unadorned" and "devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). The only fact remotely supporting Wesden's false-when-made allegation is ITW's eventual company-wide prohibition, nearly two years later, on distributors' online-marketplace sales. But as the Texas Supreme

No. 22-50769

Court has explained, a "[f]ailure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986); *see Shangdong*, 607 F.3d at 1033-35 (applying the guidance of *Spoljaric* at the 12(b)(6) stage).

To be sure, ITW's alleged nonperformance "is a circumstance to be considered with other facts to establish intent." *Spoljaric*, 708 S.W.2d at 435. But Wesden alleges no "other facts" suggesting that ITW intended not to perform. On the contrary, as the district court observed, Wesden's alleged facts support the *opposite* inference. Wesden explains that it successfully sold Auto Magic products on Amazon and other third-party online markets for almost two years after starting as a distributor in October 2018. Accounting for this fact, Wesden's fraud claim thus rests on the inference that ITW promised Wesden that it could sell on Amazon and the like for as long as it wanted,[6] then allowed Wesden to do so without interruption for nearly two years, but then—as planned all along—pulled the rug out from under Wesden to take over its hard-earned markets under the guise of a new

---

[6] Wesden emphasizes in its brief that its claim is not against Wier but instead against ITW. Wesden contends that, whether or not Wier knew of ITW's "full intentions," ITW was at least "reckless in allowing [Wier] to make the representation he made." But this reframing does not save Wesden's fraud claim. The claim rests entirely on representations made by Wier as—in Wesden's own words—ITW's "authorized representative" at the September 2018 meeting. Indeed, Wesden begins its list of alleged misrepresentations by stating that, "[t]o induce [Wesden] to become a distributor for [ITW], *Wier made the following fraudulent representations and warranties . . . .*" In sum, Wesden's complaint alleges misrepresentations by ITW only through Wier. We reject Wesden's attempt to modify its pleadings through its appellate brief.

In any case, even if we interpreted Wesden's complaint to allege that ITW fraudulently misled Wier, thereby resulting in Wier's misrepresentations to Wesden, the complaint still fails to pass 12(b)(6) muster. Wesden alleges no facts supporting a fraud theory premised on actions taken by ITW, the entity, as distinct from Wier, its agent in all relevant respects.

distributor policy. While this is a hypothetical possibility, Wesden's failure to allege any "details that would corroborate" this yearslong "fraudulent scheme," *Shandong*, 607 F.3d at 1034, means that it is not a "reasonable inference," *Iqbal*, 556 U.S. at 678; *cf. G & C Land v. Farmland Mgmt. Servs.*, 587 F. App'x 99, 104-05 (5th Cir. 2014) (affirming the summary-judgment dismissal of a Texas fraud claim on the basis that a promise of future performance was not actionable fraud because the promisor's multiple attempts to perform belied any showing that it had no intention of performing). With no factual content supporting its theory, Wesden's fraud claim amounts to bare speculation.

Accordingly, even as we view the allegations in the light most favorable to Wesden, we find that Wesden "ha[s] not nudged [its] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. At the very most, Wesden's complaint contains facts that are "merely consistent with" fraud, and thus "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)). Wesden's fraud claim was therefore properly dismissed under Rule 12(b)(6).

We affirm the district court's dismissal of the fraud claim.

### III.

Wesden also appeals the district court's summary-judgment dismissal of its claim for breach of contract. We review a district court's grant of summary judgment *de novo*. *Glassell Non-Operated Ints., Ltd. v. EnerQuest Oil & Gas, LLC*, 927 F.3d 303, 306 (5th Cir. 2019) (citations omitted). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

No. 22-50769

Again, Texas law governs the parties' dispute. *Glassell*, 927 F.3d at 306. In Texas, a breach-of-contract claim requires the plaintiff to show "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach." *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018) (per curiam) (quoting *Caprock Inv. Corp. v. Montgomery*, 321 S.W.3d 91, 99 (Tex. App.—Eastland 2010)). ITW has invoked the statute of frauds to assert that the parties' agreement is unenforceable.

Under Texas's statute of frauds,[7]

> a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

TEX. BUS. & COM. CODE § 2.201(a). Such a writing must "afford a basis for believing that the offered oral evidence rests on a real transaction." *Id.* cmt. 1. While the writing "need not contain all the material terms of the contract," it *must* contain a quantity term. *Id.* ("The only term which must

---

[7] The Texas statute of frauds is a codification of the Uniform Commercial Code's ("UCC") statute of frauds. *Cont'l Casing Corp. v. Siderca Corp.*, 38 S.W.3d 782, 787 (Tex. App.—Houston 2001). Distributorship agreements, like the one at issue here, are in essence for the sale of goods and are thus governed by the UCC. *Id.* at 788; *Coburn Supply Co. v. Kohler Co.*, 342 F.3d 372, 375 (5th Cir. 2003) ("In Texas, distributorship agreements are generally controlled by the UCC." (citing Texas law)). Neither party disputes this point.

appear is the quantity term . . . ."); *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 570 (Tex. 1996) ("[A] contract for the sale of goods for the price of $500 or more is not enforceable absent some writing evidencing a contract for the sale that has been signed and that specifies a quantity.").

The statute of frauds is an affirmative defense. *Gerstacker v. Blum Consulting Eng'rs, Inc.*, 884 S.W.2d 845, 849 (Tex. App.—Dallas 1994), (citing Tex. R. Civ. P. 94)). "Once the party pleading the statute of frauds meets the initial burden of establishing its applicability, the burden shifts to the nonmovant to establish that the statute was satisfied or that an exception exists . . . ." *Ruth v. Collazo Holdings, LLC*, No. 11-19-182, 2021 WL 1706192, at *4 (Tex. App.—Eastland Apr. 30, 2021) (describing the statute of frauds applicable to real property (citing *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 641 (Tex. 2013))).

Here, Wesden does not dispute that its agreement with ITW was for goods at a price of $500 or more and therefore comes within the ambit of the § 2.201 statute of frauds. Nor does Wesden argue that any exception to the statute of frauds applies. Instead, Wesden disputes whether the contract fails for lack of a quantity term.

Wesden's primary contention is that its agreement did not need to specify a quantity because it was a requirements contract. Under a requirements contract, a buyer promises to purchase all of its required goods exclusively from the seller. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 963 (5th Cir. 1999); Tex. Bus. & Com. Code § 2.306(a). To support this argument, Wesden points to record evidence that Breeden and Wier did not "discuss limiting the volume of sales," and that there were no "alternative sources available" for Wesden to buy Auto Magic products. Wesden emphasizes in its reply brief that ITW is the sole holder of the Auto

Magic trademark, so "the entire distribution structure" is "premised on exclusivity."

But Wesden's argument misses the mark. A requirements contract still must satisfy the statute of frauds, which demands a written quantity term. As this court has explained, "[w]hile the quantity term in requirements contracts need not be numerically stated," there must nonetheless "be some writing which indicates that the quantity to be delivered under the contract is a party's requirements." *Merritt-Campbell*, 164 F.3d at 963 (citation omitted) (applying the Texas statute of frauds). In such a scenario, "the quantity to be specified is 'a party's requirements.'" *Id.* (citation omitted); *see Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 904 (5th Cir. 2004) ("The formality of written quantity term is satisfied by a written specification that buyer will buy exclusively from seller or will buy its 'requirements' from seller."); *FFP Mktg. Co. v. Medallion Co.*, 31 F. App'x 159 (table), 2001 WL 1751430, at *2 (5th Cir. Dec. 19, 2001) (explaining that, in a requirements contract, "although the amount to be delivered does not have to be numerically stated, there must be some writing that indicates that the amount to be delivered is the party's requirements or up to a specified quantity" (applying the Texas statute of frauds)). To survive summary judgment, therefore, Wesden must point to evidence that the parties' agreement contained a written quantity or exclusivity term. We conclude that Wesden has not done so.

The parties' agreement is memorialized in Wier's October 2018 email to Breeden, welcoming Breeden to the "Auto Magic family." But the email does not specify a quantity of goods nor does it state that Wesden will buy exclusively from ITW. The email does state that ITW's credit manager has given Wesden "a credit limit of $10K until he sees a credit history pattern." Wesden asserts—in one sentence in his reply brief—that "the $10,000 credit line is itself a quantity of product in writing." But Wesden cites no authority

in support of this proposition, nor does he elaborate at all on the argument. In any case, other courts applying substantively identical statutes of frauds have disfavored the notion that a written line of credit satisfies the quantity-term requirement. *See, e.g.*, *Miller v. Wimsatt Bldg. Materials Corp.*, No. 206217, 1999 WL 33438775, at *2 (Mich. Ct. App. July 23, 1999) (concluding that "a line of credit, absent any reference to the specifics of the contract, specifically the quantity of goods to be delivered, does not create an enforceable contract that complies with [Michigan's] statute of frauds."); *Int'l Poultry Processors v. Wampler Foods, Inc.*, No. 98-4612, 1999 WL 33456488, at *4 (E.D. Pa. Apr. 29, 1999) (considering written evidence that a food supplier had extended credit to its buyer but noting that the writings still failed to "specify a quantity of goods or denote other terms of sale" and thus violated the UCC statute of frauds, as adopted by Pennsylvania and Virginia). We reach a similar conclusion here. The $10,000 figure is a credit limit; it is not a "specif[ication of] a quantity" of goods that Wesden would buy from ITW. *Lenape*, 925 S.W.2d at 570. Accordingly, Wier's October 2018 email to Breeden does not contain the terms necessary to satisfy the statute of frauds.

The email, though, has an attachment. Wesden contends that the attachment satisfies the quantity-term requirement because it shows that the parties agreed to an "'unlimited' quantity in writing, which is very specific." But this is not so. The attachment is an empty order form listing the per-unit price for each Auto Magic product. There is no quantity or exclusivity term in the price list. This document does not satisfy the quantity- or exclusivity-term requirement under the statute of frauds.

Wesden points to no other writings to make its showing. Accordingly, Wesden has identified no written term either specifying a quantity of goods or stating that Wesden will buy all of its requirements from ITW. The contract thus fails to satisfy the statute of frauds and is therefore

No. 22-50769

unenforceable.  *See* TEX. BUS. & COM. CODE § 2.201(a) ("[T]he contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."); *id.* cmt. 1 ("The only term which must appear is the quantity term . . . ."); *FFP Mktg.*, 31 F. App'x 159, 2001 WL 1751430, at *3 ("[T]he alleged [requirements] contract does not provide a specific quantity term.  Consequently, the statute of frauds bars its enforcement.").

We affirm the district court's grant of summary judgment on Wesden's claim for breach of contract.

## IV.

The judgment of the district court is AFFIRMED.