# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 12, 2025

Lyle W. Cayce
Clerk

‾‾‾‾‾‾‾‾‾‾

No. 24-40400

‾‾‾‾‾‾‾‾‾‾

Jake Ellis Daughtry; Sandra Miller Daughtry;
Joseph Ellis Daughtry; Jake's Fireworks;
Right Price Chemicals, L.L.C.;
Best Buy Industrial Supply L.L.C.;
Lab Chemical Supply L.L.C.;
Daughtry Investments L.L.C.,

*Plaintiffs—Appellants*,

*versus*

Silver Fern Chemical, Incorporated; Gilda Franco,

*Defendants—Appellees*.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:23-CV-343

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

Before Smith, Higginson, and Douglas, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Silver Fern Chemical, Inc. ("Silver Fern"), through its employee, Gilda Franco, modified records of previously sent emails before producing them to the government in response to a subpoena. That conduct, the plaintiffs say, was "fraud" that enabled the government to prosecute the plaintiffs for controlled-substances offenses. The district court dismissed claims

No. 24-40400

against Franco for lack of personal jurisdiction and claims against Silver Fern for failure to state a claim.  We affirm.

I.

Plaintiffs (collectively, the "Daughtrys") are Right Price Chemicals (a chemical retailer owned by Jake Daughtry), several Daughtry family members, and several other entities linked to the Daughtrys.  Defendants are chemical supplier Silver Fern and its employee, Gilda Franco.  Silver Fern supplied Right Price with a chemical called 1,4 butanediol ("BDO").  An "industrial solvent that has numerous innocuous uses," BDO can also be a substitute for the date-rape drug gamma-hydroxybutyric acid ("GHB").

In 2019, the Drug Enforcement Administration was investigating the distribution of BDO for illicit use.  It subpoenaed Silver Fern for its emails with Right Price about Right Price's BDO purchases.  Most relevant to this appeal are invoices and purchase confirmations generated at the times of purchase.

Franco (and Silver Fern, by attribution) doctored "more than a dozen" of those emails before producing them to the government, the Daughtrys allege.  Silver Fern's original emails hadn't included the correct Safety Data Sheet ("SDS"), which warned about BDO's potential use as a GHB substitute, or any other SDS.  Franco, however, modified the email records to appear as though they had included the correct SDS.

The Daughtrys accuse the defendants of altering the emails to (1) "help the [g]overnment with civil and criminal actions against" plaintiffs, (2) "cover [their own] tracks" after they had failed initially to provide the SDS, (3) "avoid[] criminal prosecution," or (4) "show a 'history' [that] Silver Fern was behaving according to a fictitious standard."

According to the Daughtrys, the government "rel[ied] on Silver Fern

2

communications in an attempt to establish" a key inference in its criminal case: that the Daughtrys "were not employing voluntary industry practices"—attaching the correct SDS—when selling BDO and, thus, were likely selling it for illicit purposes.

The complaint does not make clear when the plaintiffs first discovered the altered emails. In one telling, they came across the emails when the government provided them in criminal discovery in March 2021; their forensic consultant then concluded that the emails had been doctored. In another version, the plaintiffs learned of the changes "[*a*]*fter* defending [themselves] in the criminal action and in the civil action brough[t] by the [g]overnment." That would have been 2022 or later; the criminal case against Sandra Daughtry ended in 2022, and remaining plaintiffs "continue to litigate to prove their innocence." In a third story, plaintiffs discovered the doctored emails during a 2020 civil forfeiture hearing; the later-added SDS "stuck out to Jake Daughtry like a sore thumb."

Regardless of when the Daughtrys found out about Silver Fern's lies, they nowhere allege how they acted in reliance on those false statements, either before or after discovering them.

In June 2020, a grand jury indicted several members of the Daughtry family for controlled-substances offenses and money laundering. It alleged in part that they conspired to distribute BDO to "unauthorized purchaser[s]." Jake and Joseph Daughtry eventually pleaded guilty to certain offenses. Charges against Sandra Daughtry were dismissed in 2022.

The plaintiffs say that the investigation and prosecution financially injured them when the government seized their businesses and destroyed "hundreds of thousands of dollars" of their chemical inventory.

The Daughtrys sued Silver Fern and Franco, alleging that Silver Fern and Franco defrauded them by sending those doctored emails to the govern-

ment and by failing to disclose that Silver Fern was exiting the market or fabricating evidence. They also pleaded products-liability failure to warn, negligent misrepresentation, constructive fraud, and civil conspiracy.

On appeal, plaintiffs take issue with a "fraudulent" memo drafted by Silver Fern's law firm, Karr Tuttle Campbell, after a meeting with Franco. The government asked Silver Fern to explain discrepancies between the original emails and those produced by Silver Fern. Silver Fern's lawyer interviewed Franco and memorialized the meeting in a memo. In that meeting, Franco admitted to altering the emails "to cover our tracks. To cover my tracks." Franco said that Silver Fern hadn't asked her to modify the emails and had not known that she had done so. The Daughtrys allege that Silver Fern and the government worked together on the "Karr Tuttle Memorandum" to "blam[e] Gilda Franco."

The district court dismissed all claims. Rejecting the fraud claims against Silver Fern, it explained that the Daughtrys had failed to plead that its false representations to the government were "intended to reach and influence the [plaintiffs] or that . . . they relied on it to their detriment." And rejecting the products-liability claims, the court held that the plaintiffs were "intermediate distributor[s]," not the chemical's "end user[s]" who could recover under a failure-to-warn theory.

Dismissing claims against Franco, the court explained that Franco's response to the government's subpoena did not constitute sufficient contacts with Texas to establish personal jurisdiction.

Plaintiffs appeal.

## II.

We review a dismissal for lack of personal jurisdiction *de novo*, resolving factual conflicts in the plaintiff's favor. *Wien Air Alaska, Inc. v.*

*Brandt*, 195 F.3d 208, 211 (5th Cir. 1999).

We review *de novo* a Rule 12(b)(6) dismissal, "interpreting the complaint in the light most favorable to the plaintiff." *United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 204 (5th Cir. 2013) (cleaned up). "[A] complaint must contain sufficient factual matter which, when taken as true, states a claim to relief that is plausible on its face." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (cleaned up). A plaintiff alleging fraud "must state with particularity the circumstances constituting fraud," which, at a minimum, includes "the who, what, when, where, and how of the alleged fraud." *Steury*, 735 F.3d at 204.

### III.

The Daughtrys first challenge the dismissal of claims asserted against Franco for lack of personal jurisdiction.

A state may not "bind a nonresident defendant to a judgment of its courts" unless she has established "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). There are two kinds of personal jurisdiction: "general or all-purpose jurisdiction" and "specific or case-linked jurisdiction." *Id.* at 283 n.6 (cleaned up).

The plaintiffs do not invoke general jurisdiction, so we consider only specific jurisdiction, which is proper when "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Id.* at 284. "To establish personal jurisdiction in intentional tort cases, it is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff. A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by

the defendant that creates the necessary contacts with the forum." *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 495 (5th Cir. 2022) (quoting *Walden*, 571 U.S. at 286) (internal quotation marks omitted). We "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. "[M]ere injury to a forum resident is not . . . sufficient." *Id.* at 290.

In *Calder v. Jones*, 465 U.S. 783, 789 (1984), the Court held that California had jurisdiction over out-of-state libel defendants. The defendants had "impugned" in a magazine article "an entertainer whose television career was centered in California." *Id.* at 788. It "was drawn from California sources, and," as the defendants knew, "the brunt of the harm"—the plaintiff's "emotional distress and the injury to her professional reputation"—"was suffered in California." *Id.* at 788–89. That injury "would not have occurred" had the article not been "wr[itten] . . . for publication in California" and "read by a large number of California citizens." *Walden*, 571 U.S. at 288 (explaining *Calder*). Because "publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California." *Id.* (citation omitted). "In th[at] way," the California effects of the defendants' libel "connected the defendants' conduct to *California*, not just to a plaintiff who lived there." *Id.*

Under the narrow facts alleged in the complaint, which we take as true,[1] Texas has personal jurisdiction over Franco. As in *Calder*, the "effects" of Franco's alleged conduct—conduct that looks more like libel than the "fraud" that the plaintiffs call it—connect her to Texas and "not just to the plaintiff[s]." *Id.* at 287. "The strength of that connection [is] largely a function of the nature of . . . libel," which much be "communicated

---

[1] *Savoie v. Pritchard*, 122 F.4th 185, 190 (5th Cir. 2024).

to . . . third persons." *Id.* Seeking to induce a criminal prosecution against the Daughtrys in Texas, Franco did so by falsifying documents and forwarding them to federal prosecutors in Texas, "kn[owing] that the brunt of that injury [from a prosecution] would be felt" there. *See Calder*, 465 U.S. at 789–90. And the Texas injury to the plaintiffs "[could] not have occurred" had Franco not directed those documents to *Texas* prosecutors. *See Walden*, 571 U.S. at 287–88 (explaining *Calder*) ("reputational injury . . . would not have occurred" had defendants not "wr[itten] an article for publication in California that was read by a large number of California citizens").

Texas courts accordingly have personal jurisdiction over Franco. For the reasons below, though, we nonetheless affirm. *See McGruder v. Will*, 204 F.3d 220, 222 (5th Cir. 2000) ("We . . . may affirm on any grounds supported by the record.").

## IV.

The Daughtrys appeal the dismissal of their claims against Silver Fern for failure to state a claim. Though the district court dismissed six claims, they press only three theories in their opening brief: (A) fraud; (B) civil conspiracy to commit fraud; and (C) products-liability failure to warn.

## A.

The Daughtrys allege that Silver Fern and Franco defrauded them by modifying records of purchase-confirmation emails, then producing those altered emails to the government in response to a subpoena.

A fraud plaintiff must demonstrate

> (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's

reliance on the misrepresentation caused injury.

*Wesdem, L.L.C. v. Ill. Tool Works, Inc.*, 70 F.4th 285, 291 (5th Cir. 2023) (quoting *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019)). A defendant may be liable to a third person for a misrepresentation to a second person if he "intended [that the lie would] reach [the] third person and induce reliance." *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001).

The district court correctly dismissed the fraud claims. The Daughtrys have failed to allege facts showing that Silver Fern or Franco "intended that the plaintiff[s] should rely or act on the misrepresentation." *Id.* The complaint accuses the defendants of trying (1) "to show a 'history' [of] . . . behaving according to a fictitious standard," (2) to "avoid[] criminal prosecution," (3) "to help the Government with civil and criminal actions" against plaintiffs, (4) or "to cover its tracks." Those allegations, at best, show that they intended that the government—not the Daughtrys—should rely on the false statements.

Indeed, as the district court observed, their fraud theory "seems to be that Silver Fern did not intend for plaintiffs to become aware of [Silver Fern's] alleged false representation to the government." (Cleaned up.) Silver Fern thus couldn't have intended for plaintiffs to rely on those falsehoods. For example, the Daughtrys found out about the altered emails only when the government, not Silver Fern, disclosed them in criminal discovery. And, when Jake Daughtry subpoenaed Silver Fern for the emails at issue, Silver Fern omitted the doctored emails, suggesting that Silver Fern didn't want the Daughtrys to discover or rely on the false statements.

At oral argument, the plaintiffs asserted that Silver Fern produced fake documents to the government, knowing that the government would forward them to the plaintiffs during criminal discovery and intending to

influence the plaintiffs through that eventual discovery.  But "we cannot and will not consider arguments raised for the first time at oral argument." *Jackson v. Gautreaux*, 3 F.4th 182, 188 n.* (5th Cir. 2021).

And though the Daughtrys must allege that they relied on the defendants' lies, *see Wesdem*, 70 F.4th at 291, they have, at best, alleged that the *government* relied on them.  The complaint says that "the Government was relying on Silver Fern communications in an attempt to establish" elements of its criminal case; that the government, in developing its case, "look[ed] to Silver Fern's fabricated documents"; that the altered emails "resulted in Plaintiffs being criminally charged" by the government; and that the false statements "created the basis for the Government's attempts at prosecution."

Indeed, in plaintiffs' telling, when they first came across the doctored emails, they immediately recognized that the emails were modified and, thus, didn't rely on the false statements within.  The emails "stuck out to Jake Daughtry like a sore thumb because the language used was like nothing he had ever seen before from Silver Fern."  Comparing them to "the originals" he had kept, he promptly discovered the alterations.

On appeal, plaintiffs also claim that the Karr Tuttle Memorandum was "actionable fraud."  That theory appears nowhere in the complaint or in plaintiffs' opposition to Silver Fern's motion to dismiss, so we decline to address it.  *Edmiston v. La. Small Bus. Dev. Ctr.*, 931 F.3d 403, 406 n.3 (5th Cir. 2019) (declining to consider "arguments . . . not in the complaint" and where plaintiff didn't "raise[ ] [them] before the district court").

Plaintiffs assert in their reply brief, but not in their opening brief, that Silver Fern defrauded them by failing to disclose that it had decided to stop selling BDO, and why it came to that decision.  That argument is forfeited. *See Flex Frac Logistics, L.L.C. v. NLRB*, 746 F.3d 205, 208 (5th Cir. 2014).

No. 24-40400

B.

The court properly dismissed the fraud-conspiracy claim. The plaintiffs didn't adequately allege fraud, and "a civil conspiracy claim is connected to the underlying tort and survives or fails alongside it." *Agar Corp., Inc. v. Electro Cirs. Int'l, L.L.C.*, 580 S.W.3d 136, 141 (Tex. 2019).

C.

The Daughtrys challenge the dismissal of their failure-to-warn products-liability claims against Silver Fern. When Silver Fern sent invoices to Right Price at the time of Right Price's BDO purchases, it failed to attach an SDS warning that the chemical could be used as a date-rape drug. Their theory seems to be that, had Silver Fern attached the correct SDS, they would have conducted themselves differently and, thus, wouldn't have been criminally prosecuted.

A failure-to-warn products-liability claim requires that

(1) a risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product; (2) the product supplier actually knows or reasonably foresees the risk of harm at the time the product is marketed; (3) the product possesses a marketing defect; (4) the absence of the warning or instructions renders the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn causes the product user's injury.

*Olympic Arms, Inc. v. Green*, 176 S.W.3d 567, 578 (Tex. App.—Houston [1st Dist.] 2004, no writ).

The district court correctly dismissed the products-liability claim. Regardless of whether the Daughtrys, as non-users of the product, may recover under a failure-to-warn theory, *see Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 633 (Tex. 1969) ("[R]ecovery under the strict liability doctrine is not limited to users and consumers."), the Daughtrys do not claim

injuries from defects in BDO itself but, instead, assert injuries deriving from criminal prosecutions for unlawfully handling the drug. *Cf. Mid Continent Aircraft Corp. v. Curry Cnty. Spraying Serv., Inc.*, 572 S.W.2d 308, 312–13 (Tex. 1978) ("[d]istinguish[ing] . . . personal injury" from economic losses for strict-liability purposes).

The Daughtrys also press a negligent-undertaking claim under § 323 or 324A of the Restatement (Second) of Torts. But a claim under either section requires "physical harm." *See King v. Graham Holding Co.*, 762 S.W.2d 296, 300 (Tex. App.—Houston [14th Dist.] 1988, no writ). They said that they "were injured" when their businesses "were raided and closed and the individual interests of [the Daughtry family members] were reduced to nothing as the businesses could no longer operate for a period of time." They also claimed that Silver Fern's lies "resulted in an injunction that prevented the Daughtrys from opening their lawful businesses," "eliminating their sources of income and severely limiting their ability to finance their defenses." None of that is "physical harm." *See id.* (no physical harm where plaintiffs alleged financial injuries of $6 million from credit-score decrease). Nor have the Daughtrys pleaded that Silver Fern took on a responsibility not to cause financial harm that would justify imposing malpractice or a similar type of liability. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418–19 (Tex. 2011).

The district court correctly dismissed the products-liability claims.

\* \* \*

The judgment of dismissal is AFFIRMED.